ORIGINAL

FILED

No Fee

2019 NOV -4  AM 9: 30

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY_____

1  ALDEN F. ABBOTT
General Counsel
2  STEPHEN T. FAIRCHILD
3  WA Bar No. 41214; sfairchild@ftc.gov
RICHARD MCKEWEN
4  WA Bar No. 45041; rmckewen@ftc.gov
5  FEDERAL TRADE COMMISSION
915 Second Avenue, Suite 2896
6  Seattle, WA 98174
7  Tel.: (206) 220-6350; Fax: (206) 220-6366

8
ROBERT J. QUIGLEY, Local Counsel
9  CA Bar No. 302879; rquigley@ftc.gov
10  FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
11  Los Angeles, CA 90024
12  Tel.: (310) 824-4300; Fax: (310) 824-4380

13
Attorneys for Plaintiff
14

15              **UNITED STATES DISTRICT COURT**
16              **CENTRAL DISTRICT OF CALIFORNIA**

17  FEDERAL TRADE COMMISSION,
18                                              Civ. No.   **SACV 19 - 02109 JVS (ADSx)**
                     Plaintiff,
19                                              **COMPLAINT FOR PERMANENT**
                                                **INJUNCTION AND OTHER**
20                      v.                      **EQUITABLE RELIEF**

21  AMERICAN FINANCIAL SUPPORT            **FILED UNDER SEAL**
22  SERVICES INC.,

23
ARETE FINANCIAL GROUP, a
24  corporation, also d/b/a Arete Financial
25  Freedom,

26  ARETE FINANCIAL GROUP LLC,

27
CBC CONGLOMERATE LLC, also
28

1  d/b/a 1file.org,

2  DIAMOND CHOICE INC., also d/b/a
3  Interest Rate Solutions,

4  J&L ENTERPRISE LLC, also d/b/a
5  Premier Solutions Servicing,

6  LA CASA BONITA INVESTMENTS,
7  INC., f/k/a La Casa Bonita Investments
8  LLC, also d/b/a Education Loan
   Network, also d/b/a Edunet,
9

10  US FINANCIAL FREEDOM CENTER,
    INC., a corporation,
11

12  CAREY G. HOWE, individually and as
13  an officer or manager of Arete Financial
    Group; Arete Financial Group LLC;
14  CBC Conglomerate LLC; and La Casa
15  Bonita Investments, Inc.,

16  ANNA C. HOWE, individually and as
17  an officer of CBC Conglomerate LLC,

18  SHUNMIN "MIKE" HSU, individually
19  and as an officer or manager of Arete
    Financial Group; Arete Financial Group
20  LLC; CBC Conglomerate LLC; and La
21  Casa Bonita Investment, Inc.,

22  RUDDY PALACIOS a/k/a RUDDY
23  BARAHONA, individually and as an
24  officer of Arete Financial Group; Arete
    Financial Group LLC; and Diamond
25  Choice Inc.,

26  OLIVER POMAZI, individually and as
27  an officer or director of Arete Financial
28  Group; Arete Financial Group LLC; and

1  J&L Enterprise LLC, and

2  JAY SINGH, individually and as an
3  officer of American Financial Support
   Services Inc. and US Financial Freedom
4  Center Inc.,

5
6                    Defendants,

7  MJ WEALTH SOLUTIONS, LLC,

8
                     Relief Defendant.
9

10        Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its

11 Complaint alleges:

12        1.     The FTC brings this action under Sections 13(b) and 19 of the Federal

13 Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the

14 Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing

15 Act"), 15 U.S.C. §§ 6101–6108, to obtain temporary, preliminary, and permanent

16 injunctive relief, rescission or reformation of contracts, restitution, the refund of

17 monies paid, disgorgement of ill-gotten monies, and other equitable relief for

18 Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C.

19 § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. pt. 310, in

20 connection with Defendants' ongoing deceptive marketing and sale of student loan

21 debt relief services.

22        2.     Since at least April 2014, Defendants have operated an unlawful debt

23 relief scheme that preys on consumers with student loan debt. Defendants promise

24 consumers that, in exchange for the payment of an upfront fee and subsequent

25 monthly fees, Defendants will reduce consumers' monthly student loan payments

26 or eliminate all, or a substantial portion of, their federal student loan debt by

27 enrolling consumers in student loan forgiveness, consolidation, or repayment

28 programs. In numerous instances, however, Defendants fail to reduce or eliminate

1   consumers' loan balances or monthly loan payments. Defendants also break their
2   promises that they will apply consumers' monthly fee payments to Defendants
3   toward the consumers' loans and assume responsibility for servicing those loans,
4   leaving consumers on the hook for adverse consequences like increased interest
5   and delinquency. As a result, consumers who already struggle to pay their student
6   loans lose even more money to Defendants. Since the beginning of their scheme,
7   Defendants have pocketed at least $43 million in revenues from consumers.

8                          **JURISDICTION AND VENUE**

9        3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C.
10  §§ 1331, 1337(a), and 1345.

11       4.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2),
12  (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

13                              **PLAINTIFF**

14       5.     The FTC is an independent agency of the United States government
15  created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC
16  Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or
17  affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§
18  6101–6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces
19  the TSR, 16 C.F.R. pt. 310, which prohibits deceptive or abusive telemarketing acts
20  or practices.

21       6.     The FTC is authorized to initiate federal district court proceedings, by
22  its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure
23  such equitable relief as may be appropriate in each case, including rescission or
24  reformation of contracts, restitution, the refund of monies paid, and the
25  disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 57b, and 6102(c).

26
27
28

## DEFENDANTS

### Corporate Defendants

7.      Defendant **American Financial Support Services Inc.** ("AFSS") is a Delaware corporation with its current principal place of business at 500 Ygnacio Valley Road, Suite 430, Walnut Creek, CA 94596. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in Paragraph 22, AFSS has advertised, marketed, offered to provide, sold, or provided student loan debt relief services to consumers in this District and throughout the United States.

8.      Defendant **Arete Financial Group, also doing business as Arete Financial Freedom** ("Arete Financial Freedom"), is a California corporation with its current principal place of business at 1261 East Dyer Road, Suite 100, Santa Ana, CA 92705. From approximately June to August 2017, Arete Financial Freedom also listed its principal place of business in California Secretary of State filings as 5772 Bolsa Avenue, Suite 220, Huntington Beach, CA 92649. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in Paragraph 22, Arete Financial Freedom has advertised, marketed, offered to provide, sold, or provided student loan debt relief services to consumers in this District and throughout the United States.

9.      Defendant **Arete Financial Group LLC** is a California limited liability company with its principal place of business listed in California Secretary of State filings as 1261 East Dyer Road, Suite 100, Santa Ana, CA 92705. Arete Financial Group LLC sometimes also does business as Arete Financial Freedom. Arete Financial Group LLC has also operated under the name Arete Finacial [sic] Group LLC, a California limited liability company that was registered with the California Secretary of State on or about February 15, 2017, and dissolved on or about March 26, 2018. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in Paragraph 22,

1   Arete Financial Group LLC has advertised, marketed, offered to provide, sold, or
2   provided student loan debt relief services to consumers in this District and
3   throughout the United States.
4       10.     Defendant **CBC Conglomerate LLC, also doing business as**
5   **1file.org** ("1file.org"), is or was a California limited liability company with its
6   principal place of business at 1261 East Dyer Road, Suite 100, Santa Ana, CA
7   92705. 1file.org has also represented, in documents filed with the California
8   Secretary of State, that its principal place of business is or was 5862 Bolsa Avenue,
9   Suite 102, Huntington Beach, CA 92649. 1file.org's corporate status is currently
10  listed as "FTB [Franchise Tax Board] Suspended" on the California Secretary of
11  State's website. At all times material to this Complaint, acting alone or in concert
12  with others, or as part of the common enterprise described in Paragraph 22,
13  1file.org has advertised, marketed, offered to provide, sold, or provided student
14  loan debt relief services to consumers in this District and throughout the United
15  States.
16      11.     Defendant **Diamond Choice Inc., also doing business as Interest**
17  **Rate Solutions** ("Diamond Choice"), is a California corporation with its principal
18  place of business at 1261 East Dyer Road, Suite 250, Santa Ana, CA 92705.
19  Individual Defendant Palacios is the owner, and serves as chief executive officer,
20  chief financial officer, and director, of Diamond Choice. Diamond Choice has held
21  an ownership interest in Arete Finacial [sic] Group, LLC. At all times material to
22  this Complaint, acting alone or in concert with others, or as part of the common
23  enterprise described in Paragraph 22, Diamond Choice has advertised, marketed,
24  offered to provide, sold, or provided student loan debt relief services to consumers
25  in this District and throughout the United States.
26      12.     Defendant **J&L Enterprise LLC, also doing business as Premier**
27  **Solutions Servicing** ("PSS"), is a Delaware limited liability company with its
28  registered address and principal place of business at 18001 Sky Park Circle, Suites

1    L–M, Irvine, CA 92614. At all times material to this Complaint, acting alone or in

2    concert with others, or as part of the common enterprise described in Paragraph 22,

3    PSS has advertised, marketed, offered to provide, sold, or provided student loan

4    debt relief services to consumers in this District and throughout the United States.

5         13.    Defendant **La Casa Bonita Investments, Inc.**, formerly known as La

6    Casa Bonita Investments LLC, also doing business as Education Loan Network,

7    also doing business as Edunet (collectively, "La Casa Bonita"), is a California

8    corporation with its current principal place of business at 5772 Bolsa Avenue, Suite

9    220, Huntington Beach, CA 92649. La Casa Bonita Investments, Inc. is the

10   corporate successor to La Casa Bonita Investments LLC, which was a California

11   limited liability company that conducted business at 5862 Bolsa Avenue, Suite 102,

12   Huntington Beach, CA 92649. On or about August 1, 2016, La Casa Bonita

13   Investments LLC filed an Articles of Incorporation with Statement of Conversion

14   with the California Secretary of State and thereby converted into Defendant La

15   Casa Bonita Investments, Inc. At all times material to this Complaint, acting alone

16   or in concert with others, or as part of the common enterprise described in

17   Paragraph 22, La Casa Bonita has advertised, marketed, offered to provide, sold, or

18   provided student loan debt relief services to consumers in this District and

19   throughout the United States.

20        14.    Defendant **US Financial Freedom Center, Inc.** ("USFFC") is a

21   Delaware corporation with its current principal place of business at 500 Ygnacio

22   Valley Road, Suite 430, Walnut Creek, CA 94596. At all times material to this

23   Complaint, acting alone or in concert with others, or as part of the common

24   enterprise described in Paragraph 22, USFFC has advertised, marketed, offered to

25   provide, sold, or provided student loan debt relief services to consumers in this

26   District and throughout the United States.

27

28

**Individual Defendants**

15.     Defendant **Carey G. Howe** ("Mr. Howe") holds himself out as the president and an owner of Arete Financial Freedom and Arete Financial Group LLC, as a manager of 1file.org, and as the chief executive officer and sole director of La Casa Bonita. At all times material to this Complaint, acting alone or in concert with others, Mr. Howe has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts and practices set forth in this Complaint. For example, Mr. Howe has responded to consumer complaints about 1file.org lodged with the Better Business Bureau ("BBB"), and has signatory authority on Corporate Defendants' bank accounts. Mr. Howe resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

16.     Defendant **Anna C. Howe** ("Ms. Howe") holds herself out as the chief operating officer and a manager of 1file.org. At all times material to this Complaint, acting alone or in concert with others, Ms. Howe has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts and practices set forth in this Complaint. For example, Ms. Howe has responded to consumer complaints about 1file.org lodged with the BBB and has represented that she handles refunds, chargebacks, and sales-related issues for Defendants. Ms. Howe resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

17.     Defendant **Shunmin Hsu, also known as Mike Hsu**, holds himself out as the secretary, chief financial officer, and a director of Arete Financial Freedom, as a manager of Arete Financial Group LLC and 1file.org, and as the chief financial officer of La Casa Bonita. At all times material to this Complaint, acting alone or in concert with others, Mr. Hsu has formulated, directed,

1  controlled, had the authority to control, or participated in the acts and practices of

2  the Corporate Defendants, including the acts and practices set forth in this

3  Complaint. For example, Mr. Hsu has signatory authority on Corporate

4  Defendants' bank accounts, has opened a payment processing account using a

5  Corporate Defendant's email address, and has participated in marketing, sales, and

6  chargeback reduction strategies for Corporate Defendants. Mr. Hsu resides in this

7  District and, in connection with the matters alleged herein, transacts or has

8  transacted business in this District and throughout the United States.

9       18.    Defendant **Ruddy Palacios, also known as Ruddy Barahona**

10  ("Palacios"), holds himself out as the chief operating officer, an owner, and a

11  director of Arete Financial Freedom; as the chief executive officer of Arete

12  Financial Group LLC; and as chief executive officer, chief financial officer, and

13  director of Diamond Choice. At all times material to this Complaint, acting alone

14  or in concert with others, Mr. Palacios has formulated, directed, controlled, had the

15  authority to control, or participated in the acts and practices of the Corporate

16  Defendants, including the acts and practices set forth in this Complaint. For

17  example, Mr. Palacios has signatory authority on Corporate Defendants' bank

18  accounts, has opened a payment account using a Corporate Defendant's email

19  address, and has registered at least one web domain associated with Corporate

20  Defendants. Mr. Palacios resides within this District and, in connection with the

21  matters alleged herein, transacts or has transacted business in this District and

22  throughout the United States.

23       19.    Defendant **Oliver Pomazi** holds himself out as the sole owner of PSS,

24  the chief executive officer of Arete Financial Freedom, and has held himself out as

25  a director of Arete Finacial [sic] Group, LLC. At all times material to this

26  Complaint, acting alone or in concert with others, Mr. Pomazi has formulated,

27  directed, controlled, had the authority to control, or participated in the acts and

28  practices of the Corporate Defendants, including the acts and practices set forth in

1   this Complaint. For example, Mr. Pomazi has signatory authority on Corporate

2   Defendants' bank accounts, has opened a payment account using a Corporate

3   Defendant's email address, and has responded to consumer complaints lodged with

4   the BBB. Mr. Pomazi resides within this District and in connection with the

5   matters alleged herein, transacts or has transacted business in this District and

6   throughout the United States.

7          20.    Defendant **Jay Singh** holds himself out as the president, chief

8   executive officer, and director of AFSS and USFFC. At all times material to this

9   Complaint, acting alone or in concert with others, Mr. Singh has formulated,

10  directed, controlled, had the authority to control, or participated in the acts and

11  practices of AFSS and USFFC, including the acts and practices set forth in this

12  Complaint. For example, Mr. Singh has opened a payment account using a

13  Corporate Defendant's email address, is the point of contact for USFFC's website

14  registration, and has responded to consumer complaints lodged with the BBB. Mr.

15  Singh resides in California and, in connection with the matters alleged herein,

16  transacts or has transacted business in this District and throughout the United

17  States.

18                              **Relief Defendant**

19         21.    Relief Defendant **MJ Wealth Solutions, LLC** ("MJ Wealth

20  Solutions") is a California limited liability company with its principal place of

21  business listed in California Secretary of State filings as 5917 Oak Avenue #314,

22  Temple City, CA 91780. Individual Defendant Hsu serves as the chief executive

23  officer of MJ Wealth Solutions. MJ Wealth Solutions has received assets that can

24  be traced directly to Defendants' deceptive acts or practices alleged below, and it

25  has no legitimate claim to those assets. MJ Wealth Solutions transacts or has

26  transacted business in this District.

27

28

1

**COMMON ENTERPRISE**

2      22.    Defendants AFSS, Arete Financial Freedom, Arete Financial Group

3  LLC, 1file.org, Diamond Choice, PSS, La Casa Bonita, and USFFC (collectively,

4  "Corporate Defendants") operate as a common enterprise while engaging in the

5  deceptive acts and practices alleged below. Corporate Defendants conduct the

6  business practices described below through an interrelated network of companies

7  that have common ownership, identities, officers, managers, business functions,

8  employees, and office locations, that commingle funds, and that use common

9  contracts. Because these Corporate Defendants operate as a common enterprise,

10  each of them is jointly and severally liable for the acts and practices alleged below.

11  Furthermore, Defendants Carey G. Howe, Anna C. Howe, Shunmin Hsu, Ruddy

12  Palacios, Oliver Pomazi, and Jay Singh (collectively, "Individual Defendants")

13  formulate, direct, control, have the authority to control, or participate in the acts

14  and practices of the Corporate Defendants that constitute the common enterprise.

15

**COMMERCE**

16      23.    At all times material to this Complaint, Defendants have maintained a

17  substantial course of trade in or affecting commerce, as "commerce" is defined in

18  Section 4 of the FTC Act, 15 U.S.C. § 44.

19

**DEFENDANTS' DECEPTIVE STUDENT LOAN DEBT RELIEF SCHEME**

20

**Background on Student Loan Forgiveness and Repayment Programs**

21      24.    Student loan debt is the second largest class of consumer debt in the

22  United States; more than 42 million Americans collectively owe nearly $1.5 trillion

23  in student loan debt. The student loan market shows elevated levels of distress,

24  such as delinquency and default, relative to other types of consumer debt.

25      25.    To address this mounting level of distressed debt, the Department of

26  Education ("ED") and state government agencies administer a limited number of

27  student loan forgiveness and discharge programs. Most consumers, however, are

28  not eligible for these programs because of strict eligibility requirements. For

1   example, one program requires the consumer to demonstrate a total and permanent
2   disability; another applies only to consumers whose school closed while the
3   consumer was still enrolled. A third program, the Borrower Defense to Repayment
4   ("BDR"), may provide a loan discharge if the school, through an act or omission,
5   violated state law directly related to the borrower's federal student loan or to the
6   educational services for which the loan was provided.
7          26.    Other forgiveness programs require working in certain professions for
8   a period of years. Teacher Loan Forgiveness applies to teachers who have worked
9   full-time for five years in a low-income elementary or secondary school or
10  educational service agency. Public Service Loan Forgiveness ("PSLF") applies to
11  employees of governmental units or non-profit organizations who make timely
12  monthly payments for a period of ten years while employed in the public sector.
13         27.    The federal government also offers loan forgiveness through income-
14  driven repayment ("IDR") programs that enable borrowers to reduce their monthly
15  payments and have portions of their loans forgiven. IDR programs allow eligible
16  borrowers to limit their monthly payments based on a percentage of their
17  discretionary monthly income. To remain in an IDR program, borrowers must
18  recertify their income and family size annually. Obtaining forgiveness through IDR
19  programs requires a minimum of 20 or 25 years of qualifying payments.
20         28.    Because a borrower's income is likely to fluctuate over the life of the
21  loan, monthly payments under the IDR programs can vary considerably from year
22  to year. If a borrower's income were to increase over the repayment period, for
23  example, the monthly payment amount could correspondingly increase to the point
24  where those payments would pay off the loan before any amount could be forgiven
25  at the end of the repayment term.
26         29.    Consumers can apply for BDR, PSLF, IDR, and other loan repayment
27  and forgiveness or discharge programs through ED or their student loan servicers
28

1  at no cost; these programs do not require the assistance of a third-party company or

2  payment of application fees.

3    30.    ED will grant forbearance or deferment while processing applications

4  for an alternative repayment plan, and in some cases of hardship. During

5  forbearance, and, under some circumstances, during deferment, unpaid interest is

6  added to the principal balance.

7    **Defendants' Deceptive Marketing of Student Loan Debt Relief Services**

8    31.    Defendants promise to enroll consumers in student loan forgiveness,

9  consolidation, and repayment programs to reduce or eliminate their monthly

10  payments and principal balances. Defendants make these claims in radio and

11  television advertisements, on the Internet, and in telemarketing calls. In some

12  instances, in response to the Defendants' marketing materials, consumers call

13  Defendants for more information. In other instances, Defendants' telemarketers, or

14  third-party telemarketers working on Defendants' behalf, make unsolicited

15  outbound calls to consumers to offer Defendants' services and convince consumers

16  to sign up with Defendants.

17    32.    In both inbound and outbound telemarketing calls, and in public-

18  facing statements, Defendants make at least four types of deceptive claims: (1)

19  consumers who purchase Defendants' services will have their monthly student loan

20  payments reduced to a lower, specific amount or have their loan balances forgiven

21  in whole or in part; (2) most or all of consumers' monthly fee payments to

22  Defendants will be applied toward consumers' student loans; (3) Defendants will

23  assume responsibility for servicing consumers' student loans; and (4) Defendants

24  are affiliated or work directly with ED or one of ED's authorized loan servicers.

25    **Defendants' Deceptive Payment Reduction Representations**

26    33.    Defendants' telemarketers inform consumers that Defendants can

27  enroll them in programs such as BDR, PSLF, or IDR to lower their monthly

28  payments or loan balances. Defendants' representatives further tell consumers that

1   Defendants will obtain a reduction in the consumer's monthly loan payment, or
2   save the consumer a specific amount of money, if the consumer purchases
3   Defendants' services. In some instances, Defendants promise consumers that their
4   entire loan balances will be forgiven after the consumer makes lower monthly
5   payments for a specified period of time, anywhere from three to ten years.
6        34.    In fact, Defendants fail to deliver the benefits they promise.
7   Consumers consistently report that Defendants do not reduce consumers' monthly
8   loan payments or cause loan balances to be forgiven. Instead, Defendants often
9   merely contact a consumer's loan servicer to place the consumer's loans into
10  temporary forbearance or deferment status, without the consumer's authorization
11  or knowledge.
12       35.    During forbearance, borrowers are temporarily relieved of the
13  obligation to make monthly payments, but interest continues to accrue on their
14  loans and is added to the principal balance. During deferment, borrowers are
15  relieved of making monthly payments and of paying interest on some federal loans,
16  but must pay interest on others. Thus, if a consumer's loan is placed into
17  forbearance or deferment status, the consumer's loan balance increases while
18  Defendants continue to collect the consumer's monthly fees. In numerous
19  instances, consumers end up owing substantially more on their student loans after
20  signing up and paying for Defendants' services.
21       36.    Even when Defendants enroll consumers in programs such as BDR,
22  PSLF, or IDR, or consolidate consumers' loans, such consumers do not realize the
23  savings or reduction in payments that Defendants promise. Furthermore, on IDR
24  applications, Defendants frequently misstate borrowers' family sizes or indicate
25  that borrowers do not have access to their spouses' income, even though they share
26  bank accounts and file taxes jointly. Defendants do so in an effort to obtain for
27  borrowers a larger reduction in payments than the borrowers would otherwise
28  qualify for under ED regulations.

**Defendants' Payment and Servicing Misrepresentations**

37.    Defendants frequently represent that they will apply the monthly fees that consumers pay Defendants towards consumers' student loan debt. In numerous instances, however, Defendants do not send such payments to consumers' student loan servicers. Instead, Defendants collect and retain consumers' payments to enrich themselves.

38.    Furthermore, Defendants frequently represent that they will assume responsibility for servicing consumers' student loans, and that consumers should stop paying their loan servicers and instead make their loan payments to Defendants. Defendants, however, are not federal loan servicers and, despite their representations to consumers, have not taken over or purchased consumers' student loans. Defendants do not, in fact, service consumers' student loans or make payments on their behalves. As a result, consumers' loan balances increase with accumulated interest. In addition, many consumers' loans become delinquent, and some consumers have been placed in default status and their income tax refunds have been garnished.

**Defendants' Government Affiliation Misrepresentations**

39.    On their telemarketing calls with consumers, Defendants state or imply that they are affiliated, or work directly, with ED or its authorized servicers. For example, Defendants have stated that because they have a "better, more direct relationship" with ED than do its servicers, they can secure better repayment terms than consumers could obtain through their servicers. Defendants have also directly confirmed, in response to consumers' questions, that they work directly with ED.

40.    In fact, Defendants' representations in Paragraph 39 are false. Defendants are not affiliated with, and do not work directly with, ED or one of ED's authorized loan servicers. Defendants themselves are not authorized loan servicers or affiliated with or approved by ED in any manner.

1

**Materiality**

2    41.    Based on Defendants' representations, consumers believe that

3    Defendants will enroll them in programs that will reduce their monthly loan

4    payments or loan balances; that Defendants will take responsibility for servicing

5    the consumers' student loans and obtain for the consumers reductions in loan

6    payments or balances; that Defendants will apply consumers' monthly fee

7    payments to Defendants toward the consumers' loan balances; and that Defendants

8    are affiliated, or work directly, with ED or its authorized loan servicers. Relying on

9    these representations, consumers purchase the services that Defendants offer.

10

**Defendants' Upfront and Monthly Fees**

11    42.    Defendants charge an upfront fee when consumers agree to their

12    services. These upfront fees range from approximately $500 to as high as $1,800.

13    43.    Defendants require that consumers pay at least part of the upfront fee

14    before they perform any work on consumers' behalf. As Ms. Howe admitted in

15    answering a complaint about 1file.org submitted to the BBB, "We do NOT start

16    any work on a file until the first payment is made by the client." Similarly,

17    Defendants' standard-form contract states: "Following receipt of all necessary

18    information from Client and the first payment has been made, [Defendants']

19    Services will commence." Sometimes, when consumers are unable to pay the full

20    upfront fee, Defendants offer to break it into monthly installments or to allow a

21    postdated payment. In at least one instance, Defendants have also worked with a

22    third-party company to offer a separate loan to cover the upfront fee—thereby

23    piling another loan onto a consumer's existing student loans.

24    44.    In addition to the upfront fee, Defendants charge a monthly fee for

25    their purported services, typically ranging from $19 to $49.

26

**Defendants' Tactics to Perpetuate Their Unlawful Scheme**

27    45.    Defendants employ additional deceptive tactics to string consumers

28    along and prevent consumers from learning of Defendants' deception. For

1   example, Defendants induce consumers to sign a power of attorney form during the
2   signup process. Often relying on the power of attorney form, Defendants then
3   change consumers' login names and passwords on the federal student aid website,
4   and also change the email addresses consumers have registered with their loan
5   servicers to domains associated with Defendants. As a result, consumers stop
6   receiving correspondence from their loan servicers and ED and temporarily lose
7   access to their own loan information. Consumers often discover that they have
8   been scammed only after talking to their actual loan servicer and realizing that
9   Defendants have been making no payments to the servicer, while pocketing
10  consumers' payments for themselves. When consumers ask for their money back,
11  Defendants often refuse to issue full refunds, and will only issue a partial refund or
12  no refund at all.

13        46.    Defendants also require consumers to sign "service agreements" that
14  are substantially identical in content and format. These standard-form contracts
15  contain terms that were not discussed with consumers during the Defendants' sales
16  pitches, or that directly contradict Defendants' marketing materials or statements
17  made to consumers during their calls with Defendants' representatives. For
18  example, although Defendants represent in telemarketing calls that they are
19  affiliated with ED, the form contract states, in the middle of dense text, that
20  Defendants are not affiliated with a government agency.

21        47.    Consumers are often unable to spot these contradictions because
22  Defendants rush consumers through the process of signing up by creating a sense
23  of urgency. Defendants often require consumers to electronically sign forms during
24  their phone call with Defendants, without affording consumers adequate time to
25  consider the forms' language. In some cases, Defendants require consumers to
26  review and sign Defendants' multi-page service agreement on consumers' mobile
27  phones. The electronic forms use a hard-to-read font and jump from one signature
28  line to another without a meaningful opportunity for review.

1                     **Ongoing Unlawful Conduct**

2       48.    Based on the facts and violations of law alleged in this Complaint, the

3 FTC has reason to believe that Defendants are violating or are about to violate laws

4 enforced by the Commission.

5                        **THE FTC ACT**

6       49.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or

7 deceptive acts or practices in or affecting commerce."

8       50.    Misrepresentations or deceptive omissions of material fact constitute

9 deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

10              **VIOLATIONS OF THE FTC ACT**

11                       **Count I**

12   **Deceptive Student Loan Debt Relief Representations**

13       51.    In numerous instances in connection with the advertising, marketing,

14 promotion, offering for sale, or sale of student loan debt relief services, Defendants

15 represent, directly or indirectly, expressly or by implication, that:

16           a.    consumers who purchase Defendants' services generally will

17       have their monthly payments reduced or their loan balances forgiven in

18       whole or in part;

19           b.    most or all of consumers' monthly fee payments to Defendants

20       will be applied toward consumers' student loans;

21           c.    Defendants will assume responsibility for servicing consumers'

22       student loans; and

23           d.    Defendants are affiliated or work directly with ED or one of

24       ED's authorized loan servicers.

25       52.    In truth and in fact, in numerous instances in which Defendants make

26 the representations set forth in paragraph 51 of this Complaint, such

27 representations are false or not substantiated at the time Defendants make them.

28

1    53.    Therefore, Defendants' representations as set forth in paragraph 51 of

2    this Complaint are false or misleading and constitute deceptive acts or practices in

3    violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

4                      **THE TELEMARKETING SALES RULE**

5    54.    In 1994, Congress directed the FTC to prescribe rules prohibiting

6    abusive and deceptive telemarketing acts or practices pursuant to the

7    Telemarketing Act, 15 U.S.C. §§ 6101–6108. The FTC adopted the original TSR in

8    1995, extensively amended it in 2003, and amended certain provisions thereafter.

9    16 C.F.R. pt. 310.

10   55.    Defendants are "seller[s]" or "telemarketer[s]" engaged in

11   "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg). A

12   "seller" means any person who, in connection with a telemarketing transaction,

13   provides, offers to provide, or arranges for others to provide goods or services to

14   the customer in exchange for consideration. 16 C.F.R. § 310.2(dd). A

15   "telemarketer" means any person who, in connection with telemarketing, initiates

16   or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff).

17   "Telemarketing" means a plan, program, or campaign which is conducted to induce

18   the purchase of goods or services or a charitable contribution, by use of one or

19   more telephones and which involves more than one interstate telephone call. 16

20   C.F.R. § 310.2(gg).

21   56.    Defendants are sellers or telemarketers of "debt relief services" as

22   defined by the TSR, 16 C.F.R. § 310.2(o). Under the TSR, a "debt relief service"

23    means any program or service represented, directly or by implication, to

24   renegotiate, settle, or in any way alter the terms of payment or other terms of the

25   debt between a person and one or more unsecured creditors or debt collectors,

26   including, but not limited to, a reduction in the balance, interest rate, or fees owed

27   by a person to an unsecured creditor or debt collector. 16 C.F.R. § 310.2(o).

28

57.     The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fees or consideration for any debt relief service until and unless:

> (A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;
>
> (B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and
>
> (C) To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:
>
> > (1) Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or
> >
> > (2) Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.

16 C.F.R. § 310.4(a)(5)(i).

58.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity. 16 C.F.R. § 310.3(a)(2)(vii).

59.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using the service. 16 C.F.R. § 310.3(a)(2)(x).

60.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE
## Count II
### Advance Fee for Debt Relief Services

61.     In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants request or receive payment of a fee or consideration for debt relief services before:

      a.     Defendants have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

      b.     The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor.

62.     Defendants' acts or practices, as described in paragraph 61 of this Complaint, violate Section 310.4(a)(5)(i) of the TSR, 16 C.F.R. § 310.4(a)(5)(i).

## Count III
### Misrepresentation of Affiliation

63.     In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants misrepresent, directly or indirectly,

1   expressly or by implication, that Defendants are affiliated with, or endorsed or

2   sponsored by, the government or the U.S. Department of Education.

3         64.    Defendants' acts and practices, as described in paragraph 63 of this

4   Complaint, violate Section 310.3(a)(2)(vii) of the TSR, 16 C.F.R.

5   § 310.3(a)(2)(vii).

6   **Count IV**

7   **Material Debt Relief Misrepresentations**

8         65.    In numerous instances, in connection with the telemarketing of

9   student loan debt relief services, Defendants misrepresent, directly or indirectly,

10   expressly or by implication, material aspects of their debt relief services, including

11   that:

12             a.    consumers who purchase Defendants' services generally will

13   have their monthly payments reduced or their loan balances forgiven in

14   whole or in part;

15             b.    most or all of consumers' monthly fee payments to Defendants

16   will be applied toward consumers' student loans; and

17             c.    Defendants will assume responsibility for servicing consumers'

18   student loans.

19         66.    Defendants' acts and practices, as described in paragraph 65 of this

20   Complaint, violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x).

21   **Count V**

22   **Relief Defendant**

23         67.    Relief Defendant MJ Wealth Solutions has received, directly or

24   indirectly, funds and other assets from Defendants that are traceable to funds

25   obtained from Defendants' customers through the deceptive acts or practices

26   described herein.

27         68.    Relief Defendant is not a bona fide purchaser with legal and equitable

28   title to Defendants' customers' funds and other assets, and Relief Defendant will be

1 | unjustly enriched if it is not required to disgorge the funds or the value of the
2 | benefit it received as a result of Defendants' deceptive acts or practices.

3 |     69.    By reason of the foregoing, Relief Defendant holds funds and assets in
4 | constructive trust for the benefit of Defendants' customers.

5 | **CONSUMER INJURY**

6 |     70.    Consumers are suffering, have suffered, and will continue to suffer
7 | substantial injury as a result of Defendants' violations of the FTC Act and the TSR.
8 | In addition, Defendants have been unjustly enriched as a result of their unlawful
9 | acts or practices. Absent injunctive relief by this Court, Defendants are likely to
10 | continue to injure consumers, reap unjust enrichment, and harm the public interest.

11 | **THIS COURT'S POWER TO GRANT RELIEF**

12 |     71.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court
13 | to grant injunctive and such other relief as the Court may deem appropriate to halt
14 | and redress violations of any provision of law enforced by the FTC. This Court, in
15 | the exercise of its equitable jurisdiction, may award ancillary relief, including
16 | rescission or reformation of contracts, restitution, the refund of monies paid, and
17 | the disgorgement of ill-gotten monies, to prevent and remedy any violation of any
18 | provision of law enforced by the FTC.

19 |     72.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the
20 | Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as
21 | the Court finds necessary to redress injury to consumers resulting from
22 | Defendants' violations of the TSR, including the rescission or reformation of
23 | contracts, and the refund of money.

24 | **PRAYER FOR RELIEF**

25 |     Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act,
26 | 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. §
27 | 6105(b), and the Court's own equitable powers, requests that the Court:

28 |

A.      Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including a temporary restraining order and preliminary injunction, an order freezing assets, appointment of a receiver, immediate access to premises, an evidence preservation order, and expedited discovery;

B.      Enter a permanent injunction to prevent future violations of the FTC Act and the TSR;

C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D.      Enter an order requiring Relief Defendant to disgorge all funds and assets, or the value of the benefit it received from the funds and assets, which are traceable to Defendants' deceptive acts or practices; and

E.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

Dated: November 4, 2019        ALDEN F. ABBOTT
                               General Counsel


                               Stephen T. Fairchild
                               Richard McKewen
                               Attorneys for Plaintiff
                               FEDERAL TRADE COMMISSION