1  Thomas H. Bienert, Jr., State Bar No. 135311
   tbienert@bienertkatzman.com
2  Ariana Seldman Hawbecker, State Bar No. 190506
   ahawbecker@bienertkatzman.com
3  Ali Matin, State Bar No. 268452
   amatin@bienertkatzman.com
4  BIENERT | KATZMAN PC
5  903 Calle Amanecer, Suite 350
   San Clemente, California 92673
6  Telephone: (949) 369-3700
7  Facsimile:  (949) 369-3701

8
   Attorneys for Defendants
9  Carey G. Howe, Ruddy Palacios,
   and Shunmin Hsu
10

11

12              IN THE UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14  FEDERAL TRADE COMMISSION          Case No. SACV 19-02109 JVS (ADSx)

15         Plaintiff                  Assigned to Hon. James V. Selna
                                       Courtroom 10C
16
17  v.                                **CAREY G. HOWE, RUDDY PALACIOS,**
                                       **AND SHUNMIN HSU'S (1)**
18  AMERICAN FINANCIAL SUPPORT        **PRELIMINARY OPPOSITION TO OSC**
    SERVICES INC., et al.             **WHY INJUNCTION SHOULD NOT**
19                                     **ISSUE AND (2) REQUEST TO EXTEND**
20         Defendants                 **THE DEADLINE TO FILE THE**
                                       **INSTANT RESPONSIVE PLEADING**
21                                     **AND ENLARGE THE BRIEF PAGE**
                                       **LIMIT TO 30 PAGES**
22

23
                                       Date:       November 18, 2019
24                                     Time:       3:00 p.m.
25                                     Location:   Courtroom 10C

26

27

28

## **Table of Contents**

I.    Introduction..................................................................................... 1

II.   Statement of relevant facts. ............................................................ 4

      A.    Procedural posture............................................................. 4

      B.    Arete's history. .................................................................. 5

      C.    Arete's student loan consulting services. .......................... 5

      D.    The FTC's evidence is stale and does not reflect Arete's current
            business. ............................................................................ 6

      E.    Arete was an active business servicing thousands of customers until
            it was abruptly shut down by the receiver.......................... 7

      F.    Arete's debt settlement proceeds flow through a different payment
            system than its student loan services payments and there is no
            connection between Arete's debt settlement business operations and
            other Defendant Companies. ............................................. 9

      G.    The receiver has confirmed that Arete is no longer marketing a
            student loan consulting business. ...................................... 9

III.  There are no viable grounds for injunctive and other equitable relief
      against the Arete Individuals and Arete. ...................................... 10

      A.    There is no basis to enjoin the Arete Individuals and Arete due to a
            current or impending violation, i.e., "conduct relief." ................. 10

            1.    The FTC has not demonstrated a likelihood of success
                  because it does not demonstrate that the Arete Individuals
                  and Arete are currently violating, or about to violate, Section
                  5 of the FTC Act. .................................................... 11

                  a.    There is no evidence that Arete is currently telling, or
                        about to tell, consumers that it is "affiliated" with the
                        Department of Education........................................ 11

                  b.    There is no evidence that Arete is currently telling, or
                        about to tell, consumers that it will reduce student
                        loans to specific lower amount. ............................. 113

TABLES OF CONTENTS & AUTHORITIES

c.   There is no evidence that Arete is currently telling, or about to tell, consumers that their monthly fee payments reduce their student loans..........................................11

d.   There is no evidence that Arete is currently telling, or about to tell, consumers that it will "assume responsibility" for their loans. ...................................11

2.   Similarly, the FTC has not demonstrated a likelihood of success by showing that the Arete Individuals and Arete are currently violating, or about to violate, the TSR. ...........................15

a.   There is no evidence that Arete is currently violating, or about to violate, regulations regarding advance fees before service...........................................15

b.   There is no evidence that Arete is currently violating, or about to violate, regulations regarding statements about "affiliation" with the Department of Education. ...........16

B.   The equities do not favor injunctive relief. ...................................17

IV.   Supreme Court and Ninth Circuit precedent postdating cases relied upon by the FTC show that the FTC does not have authority under Section 13(b) to freeze assets or appoint a receiver. ...........................18

A.   Courts do not have authority to grant broad forms of equitable relief not explicitly authorized by Section 13(b). ...................................19

V.   *Meghrig* and Ninth Circuit authority confirm that Section 13(b) only permits the limited form of injunctive relief explicitly authorized by the text of the statute...........................................20

VI.   The Court cannot issue an asset freeze for restitution or monetary damages, and there is no basis for an asset freeze even if the FTC had the right to seek one...........................................22

A.   There is no evidence that the Arete Individuals will likely dissipate assets...........................................23

B.   The asset freeze is overbroad. ...................................25

VII.   Even if Section 13(b) authorized the appointment of a receiver, the FTC cannot meet its extraordinary burden of showing that there is no less drastic remedy...........................................26

TABLES OF CONTENTS & AUTHORITIES

VIII.  The Arete Individuals request that the Court extend time to respond to the
       OSC and enlarge the 25-page brief limit to 30-pages. ............................................28

IX.    Conclusion. .............................................................................................................29

# **Table of Authorities**

<u>Cases</u>

*Armstrong v. Exceptional Child Ctr., Inc.*,
   135 S. Ct. 1378 (2015) .................................................................................. 21

*Barnes & Noble, Inc. v. LSI Corp.*,
   849 F. Supp. 2d 925 (N.D. Cal. 2012) ....................................................... 24

*Canada Life Assur. Co. v. LaPeter*,
   563 F.3d 837 (9th Cir. 2009) ...................................................................... 26

*Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.*,
   2016 WL 6542861 (C.D. Cal. May 17, 2016) ............................................ 25

*Dateline Exports, Inc. v. Basic Const., Inc.*,
   306 F.3d 912 (9th Cir. 2002) ...................................................................... 23

*F.D.I.C. v. Garner*,
   125 F.3d 1272 (9th Cir. 1997) .................................................................... 25

*F.T.C. v. Amy Travel Serv., Inc.*,
   875 F.2d 564 (7th Cir. 1989) ...................................................................... 20

*F.T.C. v. Evans Prod. Co.*,
   775 F.2d 1084 (9th Cir. 1985) .................................................................... 12

*F.T.C. v. H. N. Singer, Inc.*,
   668 F.2d 1107 (9th Cir. 1982) .............................................................. 18, 19

*F.T.C. v. John Beck Amazing Profits, LLC*,
   2009 WL 7844076 (C.D. Cal. Nov. 17, 2009) ...................................... 23, 24

*F.T.C. v. U.S. Oil & Gas Corp.*,
   748 F.2d 1431 (11th Cir. 1984) ............................................................ 18, 19

*Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*,
   937 F.3d 764 (7th Cir. 2019) .......................................................... 19, 20, 23

*Fed. Trade Comm'n v. Shire ViroPharma, Inc.*,
   917 F.3d 147 (3d Cir. 2019) ....................................................................... 10

*FSLIC v. Sahni*,
   868 F.2d 1096 (9th Cir. 1989) .................................................................... 23

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998) .................................................................................... 21

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) .................................................................................... 21

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) .................................................................................... 23

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009) .................................................................... 23

*Lingle v. Chevron U.S.A. Inc.*,
   544 U.S. 528 (2005) .................................................................................... 27

*Meghrig v. KFC W., Inc.*,
  516 U.S. 479 (1996) .................................................................................20, 21, 22
*Miller v. French*,
  530 U.S. 327 (2000) ........................................................................................21
*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950) ........................................................................................29
*Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*,
  632 F.3d 1111 (9th Cir. 2011) ..................................................................21, 22
*Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*,
  622 F.3d 1307 (11th Cir. 2010) ......................................................................22
*Semiserve, Inc. v. Semicon Servs., LLC*,
  2015 WL 12914382 (C.D. Cal. June 17, 2015) ...............................................27
*Solis v. Matheson*,
  563 F.3d 425 (9th Cir. 2009) ....................................................................26, 27
*United States v. General Motors Corp.*,
  323 U.S. 373 (1945) ........................................................................................27
*United States v. Pewee Coal Co.*,
  341 U.S. 114 (1951) ........................................................................................27

Statutes

15 U.S.C. § 53 ......................................................................................10, 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLES OF CONTENTS & AUTHORITIES

## I.    Introduction.

The FTC's (a) heavy-handed shutdown of a legitimate business employing 150 people and serving ongoing consumer needs; and (b) freezing of both corporate and individual assets, without notice, based on flawed evidence and shaky legal support was improper and should not be extended. The FTC's voluminous under seal *ex parte* Application[1] seeks three forms of extraordinary relief against moving parties Carey Howe, Shunmin Hsu, and Ruddy Palacios (collectively, the "Arete Individuals"), Arete,[2] and the other named defendants, namely, (1) an injunction, (2) an asset freeze, and (3) a receiver, all under Section 13(b).[3]  In doing so, the FTC falsely claims that such drastic relief was appropriate.

The FTC asserts that defendants, including the Arete Individuals and Arete, are making ongoing misrepresentations regarding student debt relief services offered by Arete and other companies who are lumped together without adequate reason or differentiation. The Court granted the Application the day it was filed and set an order to show cause ("OSC") why a preliminary injunction should not issue "enjoining the violations of law alleged in the Complaint, continuing the freeze of [defendants'] Assets, [and] continuing the receivership."[4]

The FTC is not entitled to any of the relief it seeks both as a matter of law and fact.[5]

---

[1] The "Application" refers collectively to the FTC's *Ex Parte Application for Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver and Other Equitable Relief, and Order to Show Cause Why a Preliminary Inunction Should Not Issue*, the memorandum in support, and supporting evidence filed and lodged with the Court.  Dkt Nos. 1–36.

[2] "Arete" as used herein refers collectively to defendants Arete Financial Group and Arete Financial Group LLC.

[3] "Section 13(b)" refers to Title 15 U.S.C. § 53(b).

[4] OSC 29:17–18.

[5] The Arete Individuals file this preliminary opposition under time constraints, given that they were only served with the papers on November 6.  Accordingly, they reserve the right to supplement their opposition as necessary.

PRELIMINARY OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

*First*, the plain text of Section 13(b) gives the FTC limited authority to enjoin conduct.  It does not allow other forms of equitable relief, such as asset freezes and receiverships.  The Seventh Circuit confirmed this three months ago based on Supreme Court precedent holding that courts cannot read broader forms of equitable relief into Section 13(b) that are not specifically noted.  Likewise, the Ninth Circuit holds that when a statute lists only injunctive relief to the exclusion of other equitable remedies, a court cannot read other remedies into the statute.  Together, these cases make clear that the FTC does not have authority to seek asset freezes or receiverships.

Moreover, the FTC does not offer competent evidence supporting injunctive relief against Arete or the Arete Individuals.  The FTC seeks to enjoin conduct related to Arete's student loan business; however, that aspect of Arete's business was shuttered in the summer.  Within days, the receiver was able to confirm this, yet he still has not allowed Arete to resume operations.  Moreover, most of the alleged misrepresentations the FTC cites in its Application occurred months or years ago.  The few recent alleged incidents (which are themselves several months old) are disputed, equivocal, and even self-contradictory.  Regardless, the evidence that the FTC offers does not show that the Arete Individuals or Arete "***[are] violating, or [are] about to violate***, any provision of law enforced by the Federal Trade Commission," which is necessary for injunctive relief.  Consequently, the FTC cannot show a likelihood of success on the merits.

An asset freeze is equally improper.  The FTC seeks to extend a broad asset freeze to satisfy a potential "restitution" award; however, restitution is not an available equitable remedy.  Even if it were available, the FTC would have to demonstrate that the Arete Individuals and Arete are likely to intentionally dissipate assets by hiding or sheltering them from collection efforts, which it has not done.  The freeze request is also fatally flawed because it is not narrowly tailored.  Rather, the FTC seeks to also encumber assets related to Arete's ongoing debt settlement business—which comprises 90% of Arete's revenue and has not been shown to have engaged in any wrongdoing.

A receivership is the least defensible of the FTC's requests.  The FTC's purported basis for a receiver is to obtain information regarding assets, to identify other defendants, and to secure documents.[6]  None of those reasons justifies a receiver.  *First*, Section 13(b) does not explicitly authorize such a remedy, and therefore it is unavailable.  *Second*, the FTC has no property interest in any defendant entity, which is a prerequisite to seeking a receiver.  Rather, the FTC is a regulatory agency that has, in effect, seized a private business without just compensation, in contravention of the Constitution's taking clause.  *Third*, the FTC offers no evidence that there is no remedy less drastic than a receivership (such as a monitorship)—another showing that it must make.  Of course, there are far less drastic remedies than a receiver to obtain information, namely, civil discovery under the Federal Rules of Civil Procedure, which litigants use every day to obtain information from each other.  *Finally*, there is no evidence that the receiver, a lawyer, is equipped to run Arete, a going concern.  Indeed, the receiver has effectively closed down Arete, tipping the balance of equities firmly on the side of the Arete Individuals who can demonstrate severe and ongoing harm.

Indeed, the harm in granting relief, particularly as to an asset freeze or a receiver, far outweighs the harm in denying relief.  Before the receiver effectively shut down Arete, the company was an active business focused on consumer debt settlement.  As of last week, Arete was serving approximately 38,000 customer credit accounts on behalf of 7,700 debt settlement clients and employed approximately 150 people, 143 of whom work on debt settlement services.  Each day, Arete settles approximately 80 accounts for its customers, meaning that every week of non-operation imperils 560 unmanaged accounts.  Now that it can no longer serve its customers, the company's future is endangered, Arete employees' jobs are jeopardized, and Arete's current customers will not be serviced.  Consequently, if the injunction continues, it will have a potentially devastating impact on Arete customers and Arete employees.  On the other hand, there is no harm in denying an injunction because, as discussed below, Arete withdrew from the student loan consulting business before the

---

[6] Memo 29:3–5.

PRELIMINARY OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1  FTC's complaint, thus mooting any alleged need for drastic prejudgment relief.

2      Accordingly, the Court should deny the FTC's request for a preliminary injunction

3  and other equitable relief.

4  **II.    Statement of relevant facts.**

5      **A.    Procedural posture.**

6      On November 4, 2019, the FTC filed this action under seal and requested an *ex parte*

7  temporary restraining order ("TRO") freezing assets and appointing a receiver. The FTC's

8  *ex parte* request was accompanied by a 30-page memorandum supported by 11 volumes of

9  exhibits, a compact disc containing 151 minutes of recordings, and other lodged materials.

10 The court issued the TRO that same day. Two days later, the FTC arrived at Arete's

11 premises, served the Arete Individuals boxes of documents, and took control over Arete

12 from the Arete Individuals. The company was handed over to a receiver, who ceased its

13 operations. The case remained sealed until at least the end of the day on November 8, 2019,

14 and the Arete Individuals did not have access to any of Arete's records until permission was

15 granted by the receiver on November 12, 2019. Declaration of Garrison Giali ("Giali

16 Decl.") ¶ 2.

17     The Arete Individuals promptly retained counsel who reached out to the FTC and the

18 receiver to request that (1) the operations of Arete be restarted so as not to jeopardize its

19 150 employees and the company's debt settlement customers; and (2) be given access to

20 Arete records in order to prepare an opposition to the TRO and request for preliminary

21 injunction. Declaration of Ariana Seldman Hawbecker ("Hawbecker Decl.") ¶ 2. During

22 a call on November 10, 2019, counsel for the Arete Individuals explained that Arete ceased

23 marketing its student loan business and that the company's operations were focused on

24 consumer debt settlement. *Id.* ¶ 3. The Arete Individuals' counsel further explained that

25 Arete's student loan revenues flowed through different payment gateways, which would

26 make it easy for the receiver to separate the consumer debt business from the student loan

27 services business. *Id.* ¶ 3. The FTC refused the Arete Individuals' request to immediately

28 restart Arete's operations under the financial supervision of the receiver until the matter

could be further considered by the Court. *Id.* ¶ 4. While the FTC and the receiver agreed to consider a request for the Arete Individuals to obtain access to records to prepare a response to the TRO, the earliest date promised was November 12, 2019. *Id.* ¶ 4. The Arete Individuals were granted access to information on that day and are filing this response promptly thereafter.[7]

**B.    Arete's history.**

The Arete Individuals founded Arete in 2017 and together control 60% of the company.[8]   Declaration of Ruddy Palacios ("Palacios Decl.") ¶ 2. Arete's aim was to help overwhelmed consumers deal with their debt burdens. *Id.* ¶ 3. The areas where the Arete Individuals saw great need was in helping consumers (1) navigate and manage their student loan debt burden and (2) reduce their unsecured debt (primarily credit card balances that continued to grow in situations where consumers could afford to pay no more than the minimum payment). Carey G. Howe ("Howe Decl.") ¶ 2.

While Arete's business centered around offering services to help reduce, lighten, or manage debt burdens, the services provided to individuals with student loan debt were separate from those offered to consumers with consumer debt because student loan servicers, unlike unsecured credit companies, do not have the power to reduce debts owed. *Id.* ¶ 3.

**C.    Arete's student loan consulting services.**

While student loans, unlike consumer debt, are not-negotiable, there are several set programs that student loan debtors can apply for to modify or suspend their payments. Howe Decl. ¶ 4. Because some consumers are unaware of the various programs offered by

---

[7] While the circumstances merit giving the Arete Individuals additional time to respond to the FTC's Motion, each additional day without operations puts Arete's business in peril. Therefore, Arete does not want to continue the hearing date. However, Arete styles this motion as a Preliminary Opposition and may request the Court grant it additional time to submit additional opposition materials as they are collected.

[8] While there are two functioning Arete entities, the Arete Individuals have identical interests in each. Palacios Decl. ¶ 2. The primary operating entity is Arete Financial Group, LLC. *Id.*

PRELIMINARY OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

the Department of Education, their requirements, and how to apply, Arete marketed its student loan services to help individuals with student loan debt navigate these options. *Id.* ¶ 4. Those services involved informing student loan debtors of the various programs available to better manage their student loan debt, assessing their qualifications for certain programs, assisting customers in preparing and submitting required forms, and ensuring ongoing annual required recertifications. *Id.* In exchange for its consulting and processing services, Arete charged an initial fee along with a monthly maintenance fee, the latter of which was designed to ensure that its customers could reassess any change in circumstances and annually recertify their status with the Department of Education. *Id.*

**D.     The FTC's evidence is stale and does not reflect Arete's current business.**

In or around April 2019, the Arete Individuals decided to withdraw from the student loan advisory business. Howe Decl. ¶ 5. Arete announced this change to its employees and ceased marketing its student loan debt consulting business shortly thereafter by: (1) completely shutting down its student loan consulting business website; (2) ceasing to solicit those services; (3) cutting ties with affiliates who directed student loan customers to it; and (4) laying off or retraining employees to focus on the consumer debt side of the business. *Id.* The only student loan debt customers remaining are those who were signed up prior to the winding down of that business. *Id.*

The evidence offered by the FTC relates to alleged marketing several months to years old. For example, the FTC submitted a video its investigator purportedly recorded of the website aretefinancialfreedom.com on February 7, 2019. PX23, ¶45 and Att. OO. That website, devoted to Arete's former student loan business, was shut down and, for several months, anyone who tried to access that site was redirected to aretefinancial.org. *Id.* ¶ 5; Giali Decl. ¶ 3. Similarly, Attachment SS to the FTC investigator's declaration contains purported screenshots from the shuttered aretefinancialfreedom.com site that are more than six months old. PX23 ¶ 47, Attach. SS. By contrast, Arete's current website at aretefinancial.org focuses solely on debt settlement services and makes no mention of student loan services. Giali Decl. ¶ 4.

Similarly, the FTC offers screenshots from aretefin.com from April.  PX23 ¶ 48, Attach TT.  This website is also no longer operational.  Howe Decl. ¶ 6; Giali Decl. ¶ 4 (confirming a 404 Error Notice when the site is visited).  In sum, contrary to the evidence submitted by the FTC, Arete no longer markets a student loan consulting business, has no sales or marketing employees working in that area, and the only customers remaining in that business are those who enrolled several months ago.  To the extent those customers continue to pay nominal monthly service fees Arete charged for its student loan services, the processing of those fees is entirely separate from Arete's consumer debt settlement business.  Howe Decl. ¶ 7.  Moreover, the revenue from those fees represents only about 10% of Arete's monthly revenue.  *Id.*

### E. Arete was an active business servicing thousands of customers until it was abruptly shut down by the receiver.

Since its founding in mid-2017 through the time of the asset freeze last week, Arete helped thousands of customers renegotiate their debt burdens and establish manageable monthly payment plans.  Palacios Decl. ¶ 3.  Arete has settled over 15,000 credit accounts for its customers since its founding.  *Id.*  Historically, Arete's average customer has unsecured credit balances of approximately $40,000 spread over six different accounts.  The average term of customers enrolled in the debt settlement program is approximately 36-months.  *Id.*

As of last Wednesday, when the Arete Individuals were shut off from Arete's operations, Arete was serving approximately 38,000 customer credit accounts on behalf of 7,700 debt settlement clients and employed approximately 150 people, 143 of whom work on debt settlement services.  *Id.* ¶ 4.  Each day, Arete settled approximately 80 accounts for its customers, meaning that every week of non-operation imperils about 560 consumer credit accounts that Arete cannot manage due to the freeze.  *Id.*  Indeed, Arete is informed that the disruption caused by the receiver's involvement has already spurred panic among Arete customers.

Until Arete was essentially seized by the FTC based on faulty evidence, it had an "A" rating from the Better Business Bureau and overwhelmingly positive reviews. Giali Decl. ¶ 5. Now that it can no longer serve its customers, that rating has changed to "NR," imperiling the company's future. *Id*. ¶ 6.

Arete's debt settlement programs works as follows. First, Arete gathers its customers' unsecured debts and explains that it can help those consumers negotiate debt reduction and estimates for the consumer for a fixed monthly payment, and an estimated term to settle all enrolled unsecured debt. Palacios Decl. ¶ 5. Assuming the consumer decides to use Arete's services, the consumer next signs up with a third party, Debt Pay Gateway ("DPG"), to collect monthly payments in its dedicated custodial account. *Id*. Arete then negotiates a reduction of its customers debts (often at 50% of the debt amount owed) with each of their customers' creditors and works out a proposed payment plan that is consistent with their customers' ability to pay. *Id*. As consideration for this service, the customer agrees to pay a percentage of the negotiated debt reduction to Arete. *Id*. So, for example, if Arete negotiates a debt on behalf of a consumer from $10,000 to $5,000, the customer agrees to pay 15-25% of that debt amount that was settled ($1,500 to 2,500) to Arete resulting in an estimated savings to the consumer of $2,500 to $3,500. *Id*. Arete does not collect that fee for the debt until after Arete has received a settlement agreement from the creditor on behalf of the consumer, and at least one payment has been made to the creditor with whom Arete settled on behalf of the client. *Id*.

DPG, an independent, FDIC insured third party custodial trust provider collects Arete's customer's monthly payments from its debt settlement clients. *Id*. ¶ 5. After Arete shows DPG proof that it has negotiated a credit reduction and payment plan on an account via a "settlement letter," DPG sends the first negotiated payment to the customers' creditors, and it sends Arete the agreed upon fee for negotiating down that debt. *Id*. Thus, Arete does not collect any monies from consumers and is only paid *after* it has negotiated a reduction in the consumer's debt and the consumer begins payment on those debts.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F.     Arete's debt settlement proceeds flow through a different payment system than its student loan services payments and there is no connection between Arete's debt settlement business operations and other defendant companies.**

Arete's student loan customers, using credit cards, paid for Arete's services first via payment processing vendors World Pay and vPay.  Howe Decl. ¶ 8.  The processing of those payments is arranged by defendants CBC Conglomerate, LLC and La Casa Bonita (collectively, "CBC").  *Id*. ¶ 8.  Arete has no connection with defendants American Financial Support Services, Inc., US Financial Freedom Center, Inc. or Jay Singh (collectively "AFSS") beyond the fact that Arete used CBC to process student loan services payments. *Id*.  The Arete Individuals have no ownership or control over AFSS.  *Id*.

After student loan customers paid World Pay and vPay, those entities transferred those fees into Arete's operating account at Bank of America ending in -9321.[9]  *Id*. ¶ 9.  By contrast, Arete's debt settlement earnings (which, as explained above are processed through third party DPG) are primarily transferred from DPG into an Arete Bank of America account ending in -9334.[10]  *Id*. ¶ 10.  In sum, Arete's debt settlement proceeds flow through a different system than its student loan services payments that are separate and apart from the other defendant companies operating student loan consulting services.

**G.     The receiver has confirmed that Arete is no longer marketing a student loan consulting business.**

Even with less than a week to study Arete's business, the receiver has confirmed that several months ago Arete "shifted out of the student loan business . . . and [is] focused primarily on the consumer debt settlement business . . . ." Hawbecker Decl. Ex. 1 (11/12/19 McNamara letter admitting that his authority does not extend to Arete's consumer debt relief business).  He further admits that his authority does not extend to that business.  *Id*. Nevertheless, he has not allowed the Arete Individuals to re-start that business.

---

[9] *See, e.g.*, Howe Decl. Ex. 1 (October statement for that account).

[10] *See, e.g.*, Howe Decl. Ex. 2 (October statement for that BoFA account account).

1
2

**III.    There are no viable grounds for injunctive and other equitable relief against the Arete Individuals and Arete.**

3
4
5
6
7
8
9
10

The FTC seeks broad equitable relief that includes (1) "conduct relief," (2) "an asset freeze," and (3) "a temporary receiver [with] immediate access to Defendants' premises." Memo 25:11–13.  The FTC cites Section 13(b)[11] as the sole authority for such far-reaching and extraordinary equitable remedies.  Memo 16:11–12.  As discussed below, Section 13(b) only permits injunctive relief—not other forms of equitable relief, such as asset freezes and receiverships.  Even assuming Section 13(b) allowed the broad remedies the FTC seeks here, however, the FTC has failed to demonstrate with competent evidence that it is entitled to such drastic relief against the Arete Individuals and Arete.

11
12

**A.    There is no basis to enjoin the Arete Individuals and Arete due to a current or impending violation, i.e., "conduct relief."**

13
14
15
16
17
18
19
20
21
22

Section 13(b) grants the FTC authority to seek an injunction (1) against a party that "*is violating, or is about to violate*, any provision of law enforced by the Federal Trade Commission" and (2) and where relief "would be in the interest of the public."  15 U.S.C. § 53(b) (emphasis added).  The language in Section 13(b) "is unambiguous; it prohibits *existing or impending conduct*."  *Fed. Trade Comm'n v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019) (emphasis added).  Thus, "Section 13(b) does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation."  *Id*.  In granting injunctive relief, (1) courts must consider the FTC's likelihood of success and (2) the balance of the equities must favor injunctive relief.  15 U.S.C. § 53(b).

23
24
25
26
27

The FTC asserts that the Arete Individuals and Arete are ***currently*** violating FTC regulations and, therefore, the FTC is entitled to an order enjoining further violations.  Memo 18:6 ("Defendants are violating Section 5 of the FTC Act"), 20:5 ("Defendants are violating the TSR").  The FTC is wrong.  The Arete Individuals and Arete are not currently violating, or about to violate, any of those provisions.

28

---

[11] "Section 13(b)" refers to Title 15 U.S.C. § 53(b).

1. **The FTC has not demonstrated a likelihood of success because it does not demonstrate that the Arete Individuals and Arete are currently violating, or about to violate, Section 5 of the FTC Act.**

The FTC claims that all "Defendants," including the Arete Individuals and Arete, are violating Section 5 of the FTC Act by making "four false or unsubstantiated claims to induce consumers to purchase their student loan debt relief services." Memo 19:2–3. The FTC's "evidence" fails to show that Arete Individuals or Arete are making, or going to make, any such misrepresentations in the future.

a. **There is no evidence that Arete is currently telling, or about to tell, consumers that it is "affiliated" with the Department of Education.**

According to the FTC, the "Defendants represent that they are affiliated with ED or one of its authorized servicers." Memo 19:4–5. The FTC's "evidence" of this seemingly unequivocal assertion, as to Arete, is six consumer declarations cited at footnote 6 of the Memo. A review of these declarations reveals, however, that the purported evidence against Arete falls short of the FTC's claims and there simply is ***no*** evidence against Arete Individuals.

For instance, the six supposed incidents of "misrepresentation" span a period three years (March 2016 through March 2019). *See* PX1 (May 2018), PX4 (March 2016), PX6 (February 2019), PX15 (December 2017), PX16 (March 2019), PX17 (December 2017). Yet only two declarants testify as to calls that occurred this year—one in February 2019 and the other in March 2019. The February 2019 declarant claims that Arete said it "could work with the DOE to consolidate my nine loans into one loan with a 240-month term" and that it "would work with DOE to get me on a 'pay as you earn' plan." PX6 ¶ 5 at 145–46. Likewise, the March 2019 declarant claims that Arete said it "would work with my loan servicer and the DOE to reduce my student loan payments." PX16 ¶ 2 at 446. ***None*** of

these statements amounts to a representation that Arete is affiliated with the Department of Education or is one of its servicers, as the FTC claims.[12]

Second, the FTC ignores the unambiguous text of Arete's two-page contract that was forwarded to its customers.  The contract is written in plain English and contains no claim whatsoever that Arete is "affiliated" with the Department of Education.  In fact, the very first paragraph in the contract disclaims the notion of such an "affiliation":

> Arete Financial LLC provides document processing and support services to Clients applying for a Federal Student Loan Consolidation with the DOE. Arete Financial LLC will provide (a) a review of the Client's current financial situation; (b) analyze and review available Federal Student Loan Consolidation programs offered by the DOE based on Client's current financial situation; (c) following Client's selection of a program, compile information and submit on the Client's behalf a Federal Student Loan Consolidation application with the DOE (the "services").

PX1 Attach. B at 8.[13]

Finally, as discussed above, Arete has withdrawn from its student loan consulting business.  Accordingly, the FTC has presented no evidence that Arete is currently, or will imminently, tell customers that it is "affiliated" with the Department of Education or its servicers to justify extraordinary injunctive relief.  *See F.T.C. v. Evans Prod. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) (the "view that § 13(b) cannot be used to remedy past violations is supported by the statutory language" because "[t]he FTC may only seek a temporary

---

[12] The FTC also claims in footnote 6 that Arete misleads consumers into believing that it is "affiliated" with the FTC by claiming on its website that it is "the enrolling agency who submits your application with the Department of Education."  Memo 2:26–27 fn. 6.  Of course, the plain words of text clearly do not state that.  Worse still, the FTC **omits** the remainder of the quoted sentence from the website, which clearly states that "***your loan servicer still holds your loans***," thus contradicting the FTC's claim.  *See* PX 23 Attach. TT.
[13] Moreover, Arete maintained recordings of its calls confirming that its customers understood the transactions.  As an example, a true and correct recording of Arete's call with PX6, Shawn Ecrody, will be lodged as **Exhibit 3** to the Howe Declaration.

restraining order or a preliminary injunction when it believes a person 'is violating, or is about to violate' any law enforced by the FTC").

> **b.  There is no evidence that Arete is currently telling, or about to tell, consumers that it will reduce student loans to a specific lower amount.**

As to Arete, the FTC points to nine declarations to support its claim that the company "represent[s] that they enroll consumers in government loan programs that will reduce monthly payments to a specific lower amount, or reduce or eliminate student loan balances." Memo 19:6–10, 3:6–9, fn.9.  One of these incidents dates to 2016 (PX4), four date to 2017 (PX9, PX15, PX17, PX19) and two date to 2018 (PX1, PX12).  Thus, only two of these incidents of alleged "misrepresentation" occurred in 2019, one in February (PX6) and the other in March (PX16).  An examination of the 2019 declarants' testimony again reveals that the FTC lacks the evidence to back its assertions.

As discussed above, , the declarant claims that in a February 2019 call Arete stated it "could work with the DOE to consolidate my nine loans into one loan with a 240-month term" and that Arete "would work with DOE to get me on a 'pay as you earn' plan," but there is no assertion regarding the representations about the amount of the monthly payment after consolidation.  PX6 ¶ 5 at 145.  The declarant ultimately declined to pursue any agreement with Arete, stating that he "[took] action to terminate [his] contract with that company before [he] paid them" a fee.  PX6 ¶ 9 at 147.

Likewise, the declarant purporting to report on a March 2019 call with Arete states that, after conversing with an Arete representative, declarant mistakenly believed a $799 fee he paid to Arete would reduce his student loan payment to $23 a month.  PX16 ¶ 5 at 447.  But Arete's two-page contract, which is attached to the declaration, unambiguously states in plain English that: (1) "Client agrees to pay Arete Financial LLC a Service fee of $799.00 *for providing the Services*" (2) "[t]he Service fee *will only be earned after Client is approved for a program through DOE*"; and (3) "[i]f Clients's Federal Student Loan

application is not approved for a program through DOE, Arete Financial LLC *will reimburse 100% of all Client's fees* collected." PX16 Attach. B at 452 (emphasis added).

Even if Arete had not withdrawn from its student loan consulting business, the unripe evidence offered by the FTC fails to demonstrate that Arete is currently violating, or about to violate, FTC regulations, particularly given that the FTC can only point to two equivocal and contradictory complaints against Arete in 2019—the latest of which is eight months old.

          **c.**      **There is no evidence that Arete is currently telling, or about to tell, consumers that their monthly fee payments reduce their student loans.**

The FTC next claims that "Defendants represent that they apply most or all of consumers' monthly fee payments toward consumers' student loans." Memo 19:11–12. As to Arete, the FTC points to five consumer declarations, ***none of which relate to any calls from 2019***. Memo 5:19–24 fn.25 (PX1 [2018], PX4 (2016), PX12 [2018], PX15 [2017], PX17 [2017]). Moreover, the declarant's misrepresentation claims are belied by Arete's simple three-page contract, which clearly explains that the service fees are for Arete's "document processing and support services to Clients applying for a Federal Student Loan Consolidation with the DOE," including "a review of the Clients financial situation" to "analyze and review available Federal Student Loan Consolidation programs offered by the DOE based on Client's current financial situation." *See, e.g.*, PX1, Attch. B at ¶¶ 1, 4.

          **d.**      **There is no evidence that Arete is currently telling, or about to tell, consumers that it will "assume responsibility" for their loans.**

Finally, the FTC claims that "Defendants represent that they will assume responsibility for servicing consumers' loans." Memo 19:13–14. As to Arete, the FTC points to three consumer declarations that ostensibly supports its assertion. Memo 6:24–25 fn.30. Again, the FTC cites to purported incidents in prior years, two from 2017 (PX15, PX17) and one from 2018 (PX2). *Id.* And again, the FTC fails to demonstrate that Arete

is currently violating, or about to violate, FTC regulations.

> **2.    Similarly, the FTC has not demonstrated a likelihood of success by showing that the Arete Individuals and Arete are currently violating, or about to violate, the TSR.**

The FTC also asserts that "Defendants' ongoing conduct also violates three provisions of" Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and the Telemarketing Sales Rule ("TSR"), including "(1) the advance fee ban, (2) the prohibition on misrepresenting affiliation, and (3) the prohibition on material debt relief misrepresentations."   Memo 20:6–8.   Here again, there is no evidence against Arete Individuals or Arete are violating, or about to violate, the TSR.

> **a.    There is no evidence that Arete is currently violating, or about to violate, regulations regarding advance fees before service.**

The FTC states that "[t]he TSR prohibits debt relief services telemarketers from requesting or receiving fees before they successfully renegotiate, settle, or reduce at least one of a consumer's debts," and "Defendants admit that they charge a fee before working on consumers' files," pointing to footnote 148 as the purported evidence of this admission. Yet the document referenced in the footnote contains no such concession as to the Arete Individuals or Arete.   Memo 20:9–12 fn.148.

Rather, the document appears to be a response to a complaint against a separate entity, 1File.org, *not Arete*.   *See* PX23 p.1464–65.   Even so, the complaint is mistakenly directed at 1File.org.   *Id*. (stating that the complaining party "states she was contacted by 1File.org to consolidate her student loans," but "[s]he is very mistaken, because we never contacted her regarding her student loans").   Nevertheless, the FTC has taken a single unsubstantiated and mistaken complaint against a completely different entity as "evidence" of wrongdoing by the Arete Individuals and Arete.   The document simply does not represent what the FTC claims it does.

Worse still, the FTC states, in circular fashion, a purported "*lack[] [of] evidence*" that defendants La Casa Bonita Investments, LLC and US Financial Freedom Center, Inc.

previously have complied with regulations is, in itself, affirmative evidence that all defendants (including Arete) engaged in wrongdoing. *See* Memo fn.149.

Again, the FTC has presented no evidence against the Arete Individuals or Arete, and the evidence it has presented falls far short. Moreover, Arete's two-page contract clearly states that Arete's "Service fee will only be earned after Client is approved for a program through DOE," thus contradicting the FTC's claim Arete "charge[s] a fee before working on consumers' files." PX2 Attach. A at 52.[14]

b. **There is no evidence that Arete is currently violating, or about to violate, regulations regarding statements about "affiliation" with the Department of Education.**

The FTC states that "[t]he TSR makes it a deceptive practice for a telemarketer to misrepresent its affiliation with, or endorsement or sponsorship by, any person or government entity," and "Defendants routinely inform consumers that they work directly, or are affiliated with, ED, when in fact they have no relationship with ED or its contracted servicers." Memo 21:1–5. As discussed above, the FTC has failed to show that either the Arete Individuals or Arete is currently claiming affiliation with the Department of Education. Moreover, those assertions are inconsistent with the evidence offered by the FTC's own investigators, which demonstrate that Arete clearly disclaimed affiliation with

---

[14] Even if the FTC demonstrates, and the court accepts following a hearing with competent evidence, that Arete's ongoing collection of a monthly service fee is improper (which it has failed to do) the proper remedy would be to issue an order enjoining them from collecting those fees, not the broader order requested by the FTC.

the DOE.  *See* Declaration of Laureen France, PX23, Attachment OO.[15]  There is no evidence that Arete is currently violating, or about to violate, regulations regarding debt relief.

Finally, the FTC states that "[t]he TSR prohibits telemarketers from misrepresenting any material aspect of any debt relief service, including the amount of money that consumers may save," and "Defendants' material misrepresentations that violate Section 5 . . . also violate the TSR."  Memo 21:6–9.  Again, as discussed above, the FTC has failed to show that either the Arete Individuals or Arete is currently violating these prohibitions either.

**B.      The equities do not favor injunctive relief.**

Until the receiver effectively shut down Arete, the company was an active business focused on consumer debt settlement.  Arete has settled over 15,000 credit accounts for its customers since its founding in mid-2017.  As of last week, when the Arete Individuals were shut off from its operations, Arete was serving approximately 38,000 customer credit accounts on behalf of 7,700 debt settlement clients and employed approximately 150 people (143 of whom work on debt settlement services).  Each day, Arete settles approximately 80 accounts for its customers, meaning that every week of non-operation imperils the 560 accounts unmanaged accounts.  Until Arete was essentially seized by the FTC, it had an "A" rating from the Better Business Bureau.  Now that it can no longer serve its customers, that rating has changed to "NR," imperiling the company's future and jeopardizing the jobs

---

[15] The video that is part of this attachment makes it clear that Arete's only assists in helping consumers understand the DOE's various programs: "When you talk to one of our student loan specialists, they'll help you determine which federal assistance program you qualify for and help you apply"; "Our mission is to educate you about all the repayment options that loan servicers may not have informed you of"; we "will help map out a plan that works for you"; "we will work with your lenders" "prepare documents" and submit them for you; "to be clear, we do not negotiate your student loan debt."  *Id.*  That is, the site clearly set forth the services Arete offered (helping customers understand the various programs to deal with student debt) and clearly disclaimed any role in negotiating student loans.  Moreover, the website aretefin.com clearly disclosed that Arete was not part of, and did not represent, a government agency, and described the services provided.  *See* PX23, Attach. TT.

17

1  of Arete's employees.  Consequently, if the injunction continues, it will have a potentially

2  devastating impact on Arete customers and Arete employees.

3      On the other hand, there is no harm in denying an injunction because, as discussed

4  above, Arete has withdrawn from the student loan business.  Indeed, even the receiver has

5  confirmed that Arete "shifted out of the student loan business . . . and [is] focused primarily

6  on the consumer debt settlement business . . . ."  Hawbecker Decl. Ex. 1.  The FTC's

7  "evidence" in support of the TRO further confirms this, given that most of the alleged

8  wrongdoing occurred several months to years ago.  Even the most recent examples of

9  alleged wrongdoing are stale, given the fact that Arete shuttered its student loan business

10  well before the FTC filed its complaint.

11      In short, there is no basis to continue an injunction that will adversely impact Arete's

12  current debt settlement customers, ruin Arete's business, and result in 150 employees losing

13  their jobs.

14  **IV.  Supreme Court and Ninth Circuit precedent postdating cases relied upon by the**

15  **FTC show that the FTC does not have authority under Section 13(b) to freeze**

16  **assets or appoint a receiver.**

17      The plain language of Section 13(b) limits the Court's exercise of equitable remedies

18  *solely* to injunctive relief.  15 U.S.C. § 53.  Nevertheless, the FTC asserts that Section 13(b)

19  allows asset freezes and equitable receivers, citing *F.T.C. v. H. N. Singer, Inc.*, 668 F.2d

20  1107 (9th Cir. 1982) and *F.T.C. v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984)

21  for support.  Memo fns. 187, 200.  The FTC's reliance on these cases is misplaced.

22      As discussed below, courts have criticized prior case law permitting broad equitable

23  relief not explicitly authorized by Section 13(b).  Moreover, where, as here, a statute limits

24  equitable remedies solely to injunctive relief, courts cannot imply broader forms of

25  equitable relief in contravention of the statute's plain text, according to Supreme Court and

26  Ninth Circuit cases postdating *Singer* and *U.S. Oil & Gas*.  Consequently, the FTC does not

27  have authority to obtain asset freezes and receiverships under Section 13(b) as a matter of

28  law.  But even if the FTC were not barred from seeking such extraordinary relief, it has

PRELIMINARY OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1  failed to demonstrate that either form of devastating relief is warranted against the Arete
2  Individuals and Arete.

3    **A.    Courts do not have authority to grant broad forms of equitable relief not**
4    **explicitly authorized by Section 13(b).**

5  The 1982 *Singer* case relied upon by the FTC  states that "Congress, when it gave the
6  district court authority to grant a permanent injunction against violations of any provisions
7  of law enforced by the Commission, also gave the district court authority to grant any
8  ancillary relief necessary to accomplish complete justice because it did not limit that
9  traditional equitable power explicitly or by necessary and inescapable inference," thus
10  "provid[ing] a basis [under Section 13(b)] for an order freezing assets."  *Singer*, 668 F.2d
11  at 1113.  *U.S. Oil & Gas Corp.* relied on *Singer* to conclude that Section 13(b) allows the
12  appointment of receivers.  *Oil & Gas Corp.*, 748 F.2d at 1432, 1434 (stating that "[t]his
13  Court agrees with *Singer's* interpretation of § 13(b)" and holding that a "district court has
14  the inherent power of a court of equity to grant ancillary relief, including freezing assets
15  and appointing a receiver, as an incident to its express statutory authority to issue a
16  permanent injunction under Section 13 of the Federal Trade Commission Act").

17  Binding Supreme Court and Ninth Circuit authority in the intervening thirty-plus
18  years since *Singer* and *U.S. Oil & Gas* casts serious doubt on  reading such broad equitable
19  relief into Section 13(b).  The Seventh Circuit recently held that the ***only*** form of equitable
20  relief permitted under Section 13(b) is injunctive relief in *Fed. Trade Comm'n v. Credit*
21  *Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019).

22  There, the court explained the "trail" of cases permitting broader equitable remedies
23  under Section 13(b) "start[ed]" with *Singer*, yet *Singer's* analysis is "cursory."  *Id.* at 777.
24  Nevertheless, "*Singer* sparked a line of appellate cases holding that section 13(b) is a broad
25  grant of equitable authority," including "[t]he Eleventh Circuit," which "followed *Singer*'s
26  lead two years later" in *U.S. Oil & Gas.  Id*.  Indeed, the Seventh Circuit itself "was next"
27  when it "simply quoted language from *Singer* and noted that [it] had 'no reason to disagree
28  with the conclusion of our colleagues of the Ninth and Eleventh Circuits.'"  *Id*.  Building on

19

these cases, the Seventh Circuit, in *F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989), "adopted [an] expansive formulation [of equitable power], holding that section 13(b)'s statutory grant of authority to the district court to issue permanent injunctions includes the power to order any ancillary equitable relief necessary to effectuate the exercise of the granted powers." *Credit Bureau Ctr., LLC*, 937 F.3d at 778–79.

While *Amy Travel* permitted precisely the sort of overbroad relief that the FTC seeks here, just three months ago, the Seventh Circuit reversed itself in *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, effectively overruling *Amy Travel*.  After a lengthy discussion of Supreme Court cases postdating the Ninth Circuit's *Singer* decision—including most notably *Meghrig v. KFC W., Inc.*, 516 U.S. 479 (1996)—the Seventh Circuit held that "[i]t is now well settled that ***Congress, not the judiciary, controls the scope of remedial relief when a statute provides a cause of action***."  *Credit Bureau Ctr., LLC*, 937 F.3d at 782 (emphasis added).  As a result, the court declined to permit equitable restitutionary relief under Section 13(b) because the statue does not explicitly authorize it.  *Id.* at 785.  In doing so, the Seventh Circuit held that "reading section 13(b) as ***authorizing only injunctive relief***—***that is, reading it to mean what it plainly says***—harmonizes *Meghrig* with [prior Supreme Court precedent].  *Id.* (emphasis added).

The Seventh Circuit's reasoning and reliance on the Supreme Court's *Meghrig* decision applies with equal force in this case, particularly in view of complementary Ninth Circuit authority issued after *Singer*, as discussed below.

**V.   *Meghrig* and Ninth Circuit authority confirm that Section 13(b) only permits the limited form of injunctive relief explicitly authorized by the text of the statute.**

In *Meghrig*, the Supreme Court addressed whether the Resource Conservation and Recovery Act of 1976 (RCRA) permitted the equitable remedy of restitution where the governing statute limited equitable relief to a specific form of injunctive relief.  The Court held that broad equitable relief was not available, stating in relevant part that:

1
2
3
4
5

[T]he limited remedies described in § 6972(a) . . . amply demonstrate that Congress did not intend for a private citizen to be able to undertake a cleanup and then proceed to recover its costs under RCRA . . . . *"'[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it*.'"

6
7   *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 487–88 (1996) (emphasis added).

8        Since *Meghrig*, the Supreme Court has adhered to this more limited understanding
9   of judicially implied equitable remedies. *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534
10  U.S. 204, 209 (2002) ("We have therefore been especially 'reluctant to tamper with [the]
11  enforcement scheme' embodied in the statute by extending remedies not specifically
12  authorized by its text."); *Miller v. French*, 530 U.S. 327, 340 (2000) (concluding that the
13  plain meaning of a provision expressed the congressional intent to displace equitable
14  authority); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015)
15  (holding that the Medicaid Act's provision of a specific remedy and the judicially
16  unadministrable nature of the relevant statutory provision "preclude[d] the availability of
17  equitable relief" in section 30(A) of the statute); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524
18  U.S. 274, 284 (1998) (holding that courts cannot enlarge the "scope of available remedies"
19  under an implied right of action "in a manner at odds with the statutory structure and
20  purpose").    Indeed, rather than presuming that Congress authorizes the judiciary to
21  supplement express statutory remedies, the Supreme Court now recognizes that "*the
22  express provision of one method of enforcing a substantive rule suggests that Congress
23  intended to preclude others*."  *Armstrong*, 135 S. Ct. at 1385 (emphasis added).

24       The analysis is no different in the Ninth Circuit since at least 2011, as shown by
25  *Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*, 632 F.3d 1111 (9th
26  Cir. 2011).  In *Swift*, the Ninth Circuit considered Department of Transportation (DOT)
27  regulations and a statutory remedy allowing injunctive relief, namely, 49 U.S.C. § 14704,
28  to address federal Truth-in-Leasing violations.  *Id.* at 1113.  The plaintiffs in that case

argued that section 14704(a)(1)'s provision authorizing the court to provide injunctive relief also permitted them to seek other forms of equitable relief, including restitution and disgorgement for defendant Swift's past violation of Truth–in–Leasing regulations.  *Id*. at 1121.  They contended that the district court erred in finding that the statute confined the court's equitable powers to injunctive relief only.  *Id*.  The plaintiffs argued that courts always retain their full equitable powers, unless a statute expressly removes them.  *Id*.

The Ninth Circuit disagreed, explaining that applicable Supreme Court authority "contain[s] the caveat that '***unless otherwise provided by statute***,' the court retains its full equitable powers."  *Id*. (emphasis added).  "In this case," the Ninth Circuit observed, "the statute has done precisely that; it has provided a different scheme of enforcement, ***listing only injunctive relief to the exclusion of other equitable remedies***."  *Id*. (emphasis added).  The Ninth Circuit then quoted *Meghrig*, noting again that it "'is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.'"  *Id*. (quoting *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 488 (1996) as cited by *Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*, 622 F.3d 1307, 1323-24 (11th Cir. 2010)).

Given the holdings in the Supreme Court's *Meghrig* decision, the Ninth Circuit's *Swift* decision, and the Seventh Circuit's *Credit Bureau* decision*,* it is clear that the FTC can no longer rely on Section 13(b) for expansive equitable relief, such as asset freezes and receiverships, because the statute limits equitable remedies solely to a particular form of injunctive relief.  Accordingly, the Court should not grant any form of equitable remedy not explicitly authorized by the statute, which would include the remedies sought by the FTC here.

**VI.    The Court cannot issue an asset freeze for restitution or monetary damages, and there is no basis for an asset freeze even if the FTC had the right to seek one.**

The FTC asserts that "Defendants misrepresentations have caused more than $40 million in consumer injury" and seeks an asset freeze of Defendants' assets.  Memo 9:3–4; OSC 8:18–23.  The FTC also  claims that "Section 13(b) provides this Court the basis to

order an asset freeze" and "[a]n asset freeze is appropriate once the Court determines that the FTC is likely to prevail on the merits and restitution would be an appropriate final remedy," pointing to *Singer* and cases following that case for support.  Memo 26:10–12 fn.188.  As discussed above, "section 13(b) does not authorize restitutionary relief."  *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 767 (7th Cir. 2019).  Therefore, an asset freeze is impermissible as a matter of law.[16]

Even assuming an asset freeze were available, however, the FTC has not met its high burden.  First, there no evidence that Arete Individuals or Arete will likely dissipate assets. Second, the asset freeze is impermissibly overbroad.

**A.      There is no evidence that the Arete Individuals will likely dissipate assets.**

"A party seeking an asset freeze must show a ***likelihood of dissipation*** of the claimed assets, or other inability to recover monetary damages, if relief is not granted."  *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009) (emphasis added).   Here, the FTC erroneously states it has a lower burden of proof, claiming that a "mere 'possibility'" of dissipation is sufficient to obtain an asset freeze, citing *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989) for support.  *Johnson*, however, explicitly overruled the lower standard of *Sahni*.  *Johnson*, 572 F.3d at1085 n.11.

With respect to the merits (or lack thereof), the case of *F.T.C. v. John Beck Amazing Profits, LLC*, 2009 WL 7844076, at *1 (C.D. Cal. Nov. 17, 2009) is particularly instructive. There, the FTC sought "an asset freeze directed against both the corporate Defendants and the individual Defendants," contending that "an asset freeze is necessary to prevent dissipation of the individual Defendants' assets, which may be needed to satisfy a potential

---

[16] Likewise, where damages have already been suffered, a court cannot issue a preliminary injunction to prevent defendant from transferring assets in which plaintiff claims no present lien or interest. This is based on the traditional rule in equity that a judgment fixing the amount of the debt is required before creditors can interfere with their debtors' property. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319–20 (1999); *see also Dateline Exports, Inc. v. Basic Const., Inc.*, 306 F.3d 912, 914 (9th Cir. 2002) ("a district court lacks authority to issue a preliminary injunction that freezes a debtor's assets in cases involving unsecured creditors").

1  judgment of $300 million" (in contrast to the $40 million sought here)  *Id*. at *15.  The FTC

2  argued that "because Defendants have committed fraudulent acts, Defendants will likely

3  dissipate their assets to thwart potential collection activity"; therefore, "every available

4  dollar should be preserved in order to satisfy Defendants' potential liability of $300

5  million." *Id*.

6         The court rejected the FTC's argument.  Applying the correct standard, i.e., *Johnson*,

7  the court held that "there is no evidence that Defendants have ***ever previously attempted to***

8  ***intentionally dissipate, hide or otherwise shelter corporate or personal assets from an***

9  ***effort to collect a debt or judgment against Defendants***."   *Id*. (emphasis added).

10  Accordingly, the court found that "the FTC has failed to satisfy its burden of demonstrating

11  that an asset freeze is warranted." *Id*.

12         The facts here are similar.  There is no evidence that either the Arete Individuals or

13  Arete have "intentionally dissipate[d], hide or otherwise shelter[ed] corporate or personal

14  assets from an effort to collect a debt or judgment." *See id*.  Nevertheless, the FTC claims,

15  in a conclusory fashion, that an asset freeze is necessary because "Defendants' operation is

16  premised on fraud."  Memo 28:1–2.  As discussed above, the FTC has not presented any

17  evidence that Arete or the Arete Individuals are currently violating FTC regulations, let

18  alone committing "fraud," which itself is high evidentiary threshold. *Barnes & Noble, Inc.*

19  *v. LSI Corp.*, 849 F. Supp. 2d 925, 933–34 (N.D. Cal. 2012) (elements of fraud are: (1) a

20  misrepresentation; (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance;

21  and (5) resulting damage").  Indeed, the FTC does not even allege a claim for fraud in its

22  complaint.

23         Accordingly, as in *John Beck Amazing Profits, LLC*, the FTC's unsubstantiated

24  accusations of "fraud" and asset "dissipation" are insufficient to meet the high evidentiary

25  burden, particularly absent any evidence that either Arete Individuals or Arete have ever

26  attempted to hinder debt collection efforts.

27

28

**B.     The asset freeze is overbroad.**

Asset freezes, to the extent they are granted, must be narrowly tailored. *Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.*, 2016 WL 6542861, at *6 (C.D. Cal. May 17, 2016) (issuing a "narrowly-tailored" asset freeze order); *Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*, WL 12113414, at *4 (C.D. Cal. Feb. 11, 2013) (narrowly tailoring asset freeze to allow for "normal living expenses and legal fees"); *F.D.I.C. v. Garner*, 125 F.3d 1272, 1276 (9th Cir. 1997) ("To ensure that the asset freeze was as narrow as possible, the court ordered the parties to negotiate the terms of the order and to set forth their respective positions on any provisions that could not be agreed upon.").

Here, the FTC does attempt a narrowly tailored asset freeze, let alone address the issue.  The FTC's request for injunctive relief is based entirely on alleged violations of regulations relating to student loans.  Memo 1:7–8 ("Defendants in this case prey on borrowers struggling to repay their federal student loans").  As discussed above, Arete has wound down its student loan services business by (1) completely shutting down its student loan consulting business websites; (2) ceasing solicitation of those services; (3) cutting ties with affiliates who directed student loan customers to it; and (4) laying off or retraining employees to focus on the consumer debt side of the business.  The only student loan debt customers remaining are those who were signed up prior to the winding down of that business by Arete in or around May 2019.  Even the receiver has confirmed that, in or about July 2019, Arete "shifted out of the student loan business . . . and [is] focused primarily on the consumer debt settlement business . . . ."  Hawbecker Decl. Ex. 1.

Similarly, Arete processes payments related to its student loan services through a different system than the payments related to its debt settlement services.  Nevertheless, the FTC has sought, and obtained, an extraordinary broad freeze of all assets, including: "(1) all Assets of Defendants as of the time Order is entered; and (2) Assets obtained by Defendants after this Order is entered if those Assets are derived from any activity that is the subject of the Complaint in this matter or that is prohibited by this Order."  OSC 8:18–21.  The asset freeze has effectively frozen all Arete's and the Arete Individuals' funds,

including funds related to its debt settlement business, irrespective of whether any of those assets have any relation to Arete's now shuttered student loan business.

The FTC's request to maintain an extremely broad asset freeze is not (and does not attempt to be) narrowly tailored as required by law.  Consequently, even if the FTC were permitted to seek an asset freeze (which it is not), the overbroad freeze it seeks to encumber assets for consumer debt settlement services (which is unrelated to student loans debt) and all of the assets of the Arete Individuals, is reason, in and of itself, to deny the request.

## VII.    Even if Section 13(b) authorized the appointment of a receiver, the FTC cannot meet its extraordinary burden of showing that there is no less drastic remedy.

The FTC asserts that it "[a] temporary receiver is necessary to halt consumer injury and to locate and preserve business assets and records."  Memo 28:5–6.  The FTC cannot seek a receiver here for these purported reasons or any other, both as a matter of law and fact.

As discussed above, Section 13(b) does not permit equitable remedies aside from an injunction.  Even if receivers were permitted under Section 13(b), Federal Rule of Civil Procedure 66 ("Rule 66") would govern the appointment.  *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 842 (9th Cir. 2009) (Rule 66 applies "in an action where the appointment of a receiver is sought," given that "it specifically indicates a normative standard for uniform administration of receiverships in accordance 'with the historical practice in federal courts'").

In the Ninth Circuit, "[t]he appointment of a receiver is an equitable remedy that is usually specifically sought by a person who has an *interest in a property*."  *Solis v. Matheson*, 563 F.3d 425, 437 (9th Cir. 2009) (emphasis added).  "A receivership may interfere seriously with a defendant's property rights by ousting him or her from control."  *Id*.  Therefore, "[t]he appointment of a receiver is considered to be an *extraordinary remedy* that should be *employed with the utmost* caution and granted only in cases of *clear necessity* to protect plaintiff's interests in the property."  *Id*.  (emphasis added).

1    "In general, *a receiver should not be appointed without notice being given*."  *Id*. at

2    438 (emphasis added).  "Receiverships are usually imposed for a judgment creditor only

3    after a party has had an execution issued and returned unsatisfied."  *Id*. "In determining

4    whether a receiver should be appointed, courts often consider the following factors: whether

5    the defendant engaged in fraudulent conduct, whether an imminent danger of loss of

6    property exists, the inadequacy of available legal remedies, and harm to the plaintiff if the

7    request for a receivership is denied."  *Id*.

8    Here, the FTC does not address Rule 66 or any of the criteria necessary to appoint a

9    receiver.  First, the FTC has *no* property interest in Arete (or any other defendant) and,

10   therefore, has no right to seek a receiver.  Rather, the FTC is a regulatory body that has,

11   without notice, seized control of a private business through a receiver working on its behalf,

12   in contravention of the Constitution's taking provision. *Lingle v. Chevron U.S.A. Inc.*, 544

13   U.S. 528, 537 (2005) ("The paradigmatic taking requiring just compensation is a direct

14   government appropriation or physical invasion of private property."); *United States v.*

15   *Pewee Coal Co.,* 341 U.S. 114 (1951) (Government's seizure and operation of a coal mine

16   to prevent a national strike of coal miners effected a taking); *United States v. General*

17   *Motors Corp.,* 323 U.S. 373 (1945) (Government's occupation of private warehouse

18   effected a taking).  The FTC's lack of property interest is, in and of itself, a basis to deny a

19   receivership.

20   Second, the FTC has presented no evidence that there is no remedy less drastic than

21   a receivership.  *Semiserve, Inc. v. Semicon Servs., LLC,*2015 WL 12914382, at *3 (C.D.

22   Cal. June 17, 2015) ("Receivership is a remedy of last resort; a receiver should not be

23   appointed if a less drastic remedy exists.").  There are far less drastic remedies than the

24   appointment of a receiver to obtain the information that the FTC seeks, namely, civil

25   discovery under the Federal Rules of Civil Procedure, which litigants use every day to

26   obtain information from each other.  Even if the FTC could prove ongoing violations and

27   the threat of dissipation, the appointment of a monitor to oversee Arete's business is a far

28   less drastic remedy to achieve the ends sought by the FTC (*e.g*., to enjoin future violations

and conserve company assets).  What the FTC has instead done is cut off earnings from a legitimate consumer debt settlement business that could repay any damages for purported past violations to the extent they are later demonstrated as recoverable.

Third, the FTC has presented no evidence that Arete Individuals or Arete have engaged in fraudulent conduct, that there is an imminent danger of loss of property, or that the FTC will be harmed if the request for a receivership is denied, all of which are factors courts consider before appointing a receiver.

Fourth, there is no evidence that the receiver is equipped to run a business (Arete) employing over 150 people and servicing 7,700 customers that rely on Arete to assist them with managing debt burdens.  In addition to the Arete Individual's livelihoods, both Arete's clients and its employees are jeopardized by the abrupt installation of a third party who has no experience with Arete's business and has effectively shut down the business.

Accordingly, the Court should not continue the appointment a receiver as to any of the entities in which the holds no interest, but particularly not as to Arete, a going concern that will be devasted absent stable leadership that understands how the company operates.

## VIII.  The Arete Individuals request that the Court extend time to respond to the OSC and enlarge the 25-page brief limit to 30-pages.

The Court issued its OSC on November 4, 2019 and set a hearing for November 18. OSC 29:14–19.  The Arete Individuals were not served with the OSC, the FTC's *ex parte* papers, or any other pleadings until two days later, on November 6.  The OSC provides that a response to the OSC is due "no later than *five (5) court days* prior to the order to show cause hearing" set for November 18.  OSC 29:25–26 (emphasis in original).  Thus, responses were due on November 8—just *two days* after service of process and at a time when the Arete Individuals were shut off from accessing Arete's business records due to the TRO.

The Arete Individuals request that (i) the Court extend the deadline by which to respond to the OSC and deem this response timely and (ii) and enlarge the 25-page brief limit to 30 day pages to allow the Arete Individuals a fair opportunity to respond to the

FTC's 30-page Memo (which contains 212, often lengthily, single-spaced footnotes) . It is not clear why the FTC waited two days before serving the Arete Individuals. Nevertheless, they immediately sought to secure counsel and did so by Friday evening, on November 8, *i.e.*, the day responses were due.

It is not feasible for a party to secure counsel, marshal evidence, and respond to an oversized no-notice *ex parte* brief and voluminous exhibits within the span of two days, particularly after (a) the FTC seized Arete Individuals' assets and (b) a receiver dramatically disrupted the Arete Individuals' business. Given the circumstances, there is good cause to extend the Arete Individuals' deadline to respond to the OSC and enlarge their brief page limit to 30 pages, consistent with basic principles of due process and fair play. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

## IX. Conclusion.

The Court should deny any form of equitable relief sought by the FTC, as discussed above.

Dated: November 13, 2019                    BIENERT | KATZMAN PC


By: _____
    Thomas H. Bienert, Jr.
    Ariana Seldman Hawbecker
    Ali Matin
    Attorneys for Defendants
    Carey G. Howe, Ruddy Palacios,
    and Shunmin Hsu

## ARIANA SELDMAN HAWBECKER

I, Ariana Seldman Hawbecker, declare as follows:

1.     I am a partner at the law firm of Bienert | Katzman PC (the "Firm"), attorneys for Carey G. Howe, Ruddy Palacios, and Shunmin Hsu (the "Arete Individuals"). I am a member in good standing with the State Bar of California and am admitted to practice in the Courts of California, and the Central District of California. I have personal knowledge of the facts set forth in this declaration and if called as a witness could and would competently testify to such matters.

2.     On November 8, 2019, the Arete Individuals retained our Firm. Later that same day, we sent an email to attorneys for the FTC and the receiver, Thomas McNamara, that stated, in relevant part:  "We were retained this afternoon to represented Ruddy Palacios, Shunmin Hsu and Carey Howe in association with a TRO and complaint served on them on Wednesday. There are a few pressing issues that need to be addressed. First, our clients are concerned about the ongoing operation of Arete Financial. Our preliminary understanding is that around 90% of Arete's business is associated with standard consumer debt resettlement, not student loans and that, in fact, the company has no ongoing marketing services related to that area. Therefore, our clients want to take steps to ensure the consumer debt portion of the business continues because any disruption in its operations will potentially result in the job losses of numerous employees. Moreover, consumers who rely on the company to ensure that their debt workouts are maintained through the company's payment procedures may default with severe consequences." We arranged a call for the following day.

3.     During a call on November 10, 2019 with the FTC and the receiver, my partner Tom Bienert and I explained that Arete ceased marketing its student loan services business several months prior and that the company's operations were focused on consumer debt settlement. We  further explained that Arete's student loan revenues flowed through different payment gateways, which would make it easy for the receiver to separate the consumer debt business from its the student loan services business to allow the consumer

debt portion of the business to run, keep its 150 employees employed, and not jeopardize the rights of its current customers.

4.     The FTC declined our request to immediately restart Arete's operations under the financial supervision of the receiver until the matter could be further considered by the Court.  While the FTC and the receiver agreed to consider a request for the Arete Individuals to obtain access to records to prepare a response to the TRO and PI, the earliest date promised given the weekend and intervening holiday was November 12, 2019.

5.     On November 12, 2019 at 7:17 p.m. the receiver sent the letter attached as **Exhibit 1**.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed the 13th day of November 2019 at San Clemente, California.

Ariana Seldman

DECLARATION OF ARIANA SELDMAN HAWBECKER

# EXHIBIT

# "1"

REGULATORYRESOLUTIONS

THOMAS W. MCNAMARA
OFFICE    619-269-0400
FAX       619-269-0401
DIRECT    619-269-0499
info@regulatoryresolutions.com
regulatoryresolutions.com

November 12, 2019

Stephen T. Fairchild
Richard McKewen
Federal Trade Commission
915 Second Ave., Suite 2896
Seattle, WA 98174
*Attorneys for FTC*
Via Email (sfairchild@ftc.gov;
rmckewen@ftc.gov)

Thomas H. Bienert, Jr.
Ariana Hawbecker
Bienert Katzman PC
903 Calle Amanecer
San Clemente, 92673 CA
*Attorneys for Ruddy Palacios, Shunmin Hsu
and Carey Howe*
Via Email (tbienert@bienertkatzman.com;
ahawbecker@bienertkatzman.com)

Re:   *Federal Trade Commission v. American Financial Support Services Inc., et al.*
      U.S. District Court (C.D. Cal.) Case No. 8:19-cv-02109-JVS (ADSx)

Dear Sirs/Madam:

We expect to file our Preliminary Report with the Court this Thursday, November 14.  I write to
follow up on our recent telephone call regarding the operations of Receivership Entity Arete
Financial Freedom.  Defense counsel indicated that only 10% of Arete's revenue comes from
student loan debt relief services and 90% from consumer debt settlement services.

We have reviewed records and materials found on site at Dyer Road and the other three locations
from which Defendants operated, Sky Park Circle, Irvine, Bolsa Ave., Huntington Beach, and
Ygnacio Valley Road, Walnut Creek.  We located ample evidence that Defendants operate a
student loan debt relief operation through a common enterprise at four addresses, with
interlocking ownership and funds flowing among various Receivership Entities.  This student
loan debt relief business was in operation at some level at all sites when we gained immediate
access on Wednesday, November 6.[1]

In our first meeting that morning, Individual Defendants Hsu, Palacios and Carey Howe told us
that Arete stopped enrolling new student loan debt relief customers four months ago – though
they noted Arete continued to receive customer payments for annual student debt loan

_____

[1]  Our Preliminary Report will provide detail on what we found and the investigation we
undertook.

655 West Broadway, Suite 1600, San Diego, CA 92101

Federal Trade Commission
Bienert Katzman PC
November 12, 2019
Page 2

recertification services.[2]  Our subsequent review of documents at the Dyer Road offices reveals
that up until roughly July of 2019, Arete was in both the student loan debt relief and consumer
debt settlement business.  At about that time, Arete shifted out of the student loan business
operating at Dyer Road and focused primarily on the consumer debt settlement business at that
location.[3]  But that shift was incomplete[4] and the debt settlement business has incorporated the
cash flow and infrastructure of the Receivership Entities' common enterprise student loan debt
relief business.

Arete's shift to only consumer debt relief raises the question of whether my authority as Receiver
extends beyond the student loan debt relief business to the consumer debt settlement business.  I
must conclude that it does not.  I believe the TRO itself is limited to the student loan debt relief
services.[5]  Nevertheless, I am obligated by the TRO to preserve the assets and documents of
Receivership Entities who have operated, and continue to operate, an unlawful student loan
business as a common enterprise.[6]  In order to fulfill my duties to take custody, control, and
possession of Receivership Entities' assets and to preserve their value, I shall continue to
maintain exclusive control of the Dyer Road site.  As provided in the TRO (Section XII.Q), I will

---

[2]  They readily admitted that Arete was taking prohibited advance fees for their student loan debt
relief services in violation of the Telemarketing Sales Rule.
[3]  Our Preliminary Report will elaborate on our due diligence steps we took to confirm the shift
to consumer debt settlement business.

[4]  As noted above, and as will be detailed in our Preliminary Report, Arete continued to process
recertification fees and applications for student loan customers from Suite 250 at Dyer Road.
The common enterprise also continued their student loan operations from the other three sites –
Arete was very interconnected to those operations.

[5]  See e.g., Finding of Fact B (TRO, page 1) recites the misrepresentations about the nature of the
student loan debt relief services and the charging of unlawful upfront fees for their services.
Finding of Fact C (TRO, page 2) includes an express finding that "the FTC has established a
likelihood of success in showing that Defendants have made deceptive representations in the
marketing and sale of student loan debt relief services and collected unlawful advance fees from
consumers."  The "Prohibited Business Activities" section (Section I, pages 5-6) identifies four
specific misrepresentations as to consumer student loans and the requesting or receiving of
advance fees.

[6]  Those duties include:  taking exclusive custody, control, and possession of all Assets and
Documents of any Receivership Entity (Section XII.B); conserve, hold, manage, and prevent the
loss of all Assets of the Receivership Entities, and performing all acts necessary or advisable to
preserve the value of those Assets (Section XII.D); and take all steps necessary to secure and
take exclusive custody of each location from which the Receivership Entities operate their
business (Section XII.H).

Federal Trade Commission
Bienert Katzman PC
November 12, 2019
Page 3

provide Defendants and their representatives reasonable access to the premises for the limited purpose to inspect and copy books, records, documents and other property.

Very truly yours,

Thomas W. McNamara

TWM:jej