# EXHIBIT A

*Federal Trade Commission v.*
*American Financial Support Services Inc., et al.*
U.S. District Court (C.D. Cal.) Case No. 8:19-cv-02109-JVS (ADSx)

**PRELIMINARY REPORT OF TEMPORARY RECEIVER**

Thomas W. McNamara
Regulatory Resolutions
655 West Broadway, Suite 1600
San Diego, California 92101
Telephone: 619-269-0400
Facsimile:  619-269-0401
*Temporary Receiver*

EXHIBIT A
Page 1

# **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................1
II. RECEIVERSHIP ACTIVITIES ......................................................................2
    A.    Immediate Access – Operations Summary ........................................2
        1.    1261 East Dyer Road, Suites 100, 200, and 250 Santa Ana, CA ...............................................................................3
        2.    5772 Bolsa Avenue, Suite 220, Huntington Beach, CA ...........8
        3.    18001 Sky Park Circle Suites L-M, Irvine, CA.......................12
        4.    500 Ygnacio Valley Road, Suite 430, Walnut Creek CA ........15
    B.    Bank Accounts .................................................................................16
    C.    Documents/Information/Electronic Data ...........................................17
    D.    Accounting .......................................................................................18
    E.    Vehicles ...........................................................................................18
III. DEFENDANTS' STUDENT LOAN DEBT RELIEF BUSINESS .................19
    A.    Unlawful Advance Fees ....................................................................19
    B.    Defendants' Sales Pitch Incorporates Prohibited Misrepresentations ............................................................................20
    C.    Common Enterprise ..........................................................................21
IV. DEFENDANTS' CONSUMER LOAN DEBT SETTLEMENT BUSINESS ........................................................................................................22

i

# I.

## INTRODUCTION

I was appointed temporary receiver ("Receiver") of the Receivership Entities by the Temporary Restraining Order ("TRO") entered November 4, 2019.[1]

By this Preliminary Report, I convey to the Court my team's preliminary observations and initial actions.  In summary:

- Since 2014, Receivership Entities have operated a common enterprise to sell student loan debt relief services in multiple iterations from various sites, including the four sites identified in the TRO.  Those sales were based on advance fees and deceptive representations prohibited by the TRO; we have suspended those operations.

- Beginning July, 2019 Receivership Entity Arete Financial Freedom shifted its operations at the Dyer Road site in Santa Ana away from student loans to focus on its consumer debt settlement business.  But, this shift was hardly a clean break – customer payments for student

---

[1]  Receivership Entities are defined in the TRO to mean Corporate Defendants, "as well as any other entity that has conducted any business related to Defendants' marketing and sales of Debt Relief Services, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that Receiver determines is controlled or owned by any Defendant."  *See* TRO, Definitions, page 5.  Corporate Defendants are defined to mean American Financial Support Services, Inc; Arete Financial Group, also d/b/a Arete Financial Freedom; Arete Financial Group LLC; CBC Conglomerate LLC, also d/b/a 1file.org; Diamond Choice Inc, also d/b/a Interest Rate Solutions; J&L Enterprise LLC, also d/b/a Premier Solutions Servicing; La Casa Bonita Investments, Inc., f/k/a La Casa Bonita Investments LLC, also d/b/a Education Loan Network, also d/b/a Edunet; US Financial Freedom Center, Inc; and each of their subsidiaries, affiliates, successors, and assigns.  *See* TRO, Definitions, page 3.

Pursuant to the procedure in TRO Section XII.U, I have designated the following entities to be additional Receivership Entities based on my determination that they have received Assets derived from Defendants' student loan debt relief business and are controlled or owned by any Defendant: AZ Marketing and Management Group, Fusion Graphics, Summit Holding Group Inc., and FNZA Marketing, LLC, d/b/a Student Loan Pro.

EXHIBIT A
Page 3

loan services were still being collected up to the date of the Receiver's entry.[2]

- Because the express terms of the TRO are limited to the student loan debt relief business, I make no determination as to the lawfulness of the debt settlement business, except I have determined I must maintain exclusive control over the Dyer Road site as necessary to protect the Documents and Assets of the Receivership Entities.

## II.

## RECEIVERSHIP ACTIVITIES

### A.    Immediate Access – Operations Summary

As authorized by the TRO (Section XII.H), we took control and exclusive custody of four identified locations from which Receivership Entities operate their business, commencing at approximately 11:30 a.m. on November 6, 2019 and supported by law enforcement officers.  After securing each site, we retained locksmiths who changed all exterior locks.  We also provided access to the three Orange County sites to counsel and other representatives of Plaintiff Federal Trade Commission ("FTC").  Exhibit 1 contains schematics of each site and an inventory of property located at each site.

Through the immediate access process, we were able to glean the basic metrics of Defendants' businesses and confirm that student loan debt relief operations were ingrained with practices prohibited by the TRO (advance fees and deceptive representations).  While operations emanated from four sites (three in

///

---

[2]  Individual Defendant Carey Howe has filed a declaration claiming Arete wound down its student loan business in April 2019.  But, our review of business records indicates that since April 1, 2019, Arete has taken in $2,447,000 in student loan debt relief collections.  $1.1 million of that was collected between July 1, 2019 through November 6, 2019.  $234,000 was collected from October 1, 2019 through November 6, 2019.  For the period of April 1, 2019 through November 6, 2019, Receivership Entities Arete, Premier Solutions Servicing, and 1file.org in the aggregate collected $5.5 million in student loan customer fees.

2

Orange County and one in Northern California), Defendants' student loan businesses were an interconnected common enterprise.

1.     1261 East Dyer Road, Suites 100, 200, and 250 Santa Ana, CA

This Dyer Road site (three separate suites in a two-story office building) is ground zero for Defendants' businesses. It is the primary location of Arete Financial.[3] Four of the six Individual Defendants have offices here[4] and were present in Suite 100 at the time of immediate access – Defendants Shunmin "Mike" Hsu ("Hsu"), Ruddy Palacios ("Palacios"), Carey Howe ("Howe"), and Oliver Pomazi a/k/a Loc Phu ("Phu"). Unfortunately, Phu did not identify himself and slipped out of the office under cover of the large number of employees onsite.[5]

We learned via a review of tax returns and a draft Operating Agreement located onsite that Arete is owned and controlled by five people, each with a 20% interest – Individual Defendants Hsu, Palacios, Howe, and Phu, and Syed Gilani. Except for Hsu, all the owners hold their interests in the names of third party fronts: Palacios through Defendant Diamond Choice Inc.; Howe through a relative named Caroline Howe; Syed Gilani through Judith Noh whom we believe is a relative; and Phu through his own a/k/a Oliver Pomazi.

///

---

[3] The TRO identifies two Arete entities as Corporate Defendants and Receivership Entities – Arete Financial Group also d/b/a Arete Financial Freedom and Arete Financial Group LLC. For purposes of this report, they are referred to collectively and interchangeably as "Arete."

[4] The exceptions are Individual Defendant Jay Singh whose office is in Walnut Creek and Individual Defendant Anna Howe who previously had an office at Dyer Road, but is now based at the Bolsa Avenue location in Huntington Beach.

[5] Although he slipped out afterwards, Mr. Phu was in the employee group when I explained the TRO and appointment of a receiver – as such, he was aware of the existence of the Court's order almost immediately. Defendants Hsu and Howe were initially not anxious to identify themselves either – Hsu attempted to walk out of the office and Howe mixed in with the employees without identifying himself. They were later cooperative, if not always forthright. For example, Palacios, Hsu and Howe were directly asked about Phu, and they falsely claimed he had not been involved in the business for 18 months. At the time they made this false statement, they were in an office shared by Howe and Phu and only steps from Phu's desk.

3

Each owner operates from one of the exterior offices – Palacios/Hsu shared an office, Howe/Phu shared an office, and Gilani had his own office.[6]  We found a large poster photograph of the five owners dressed in Dodgers jerseys on the wall of Phu's and Howe's office.  *See* Exhibit 2.  The five owners also share a chat group on WhatsApp and a five-way email distribution group labeled "Arete Management."

We have also confirmed that Individual Defendants have in the aggregate pulled millions of dollars out of the operation and that each drives an exotic car leased and paid for by the business (including a Lamborghini SUV, Rolls Royce SUV, Mercedes Benz G-wagon, and a BMW 750i).

Almost immediately at our arrival, Palacios, Howe, and Hsu claimed that Arete had stopped new enrollments for student loan debt relief services in roughly July of 2019.  They acknowledged one exception – they continue to charge monthly recertification fees for existing student loan debt relief customers which they readily concede are unlawful advance fees.  Palacios justified continued collection of these recertification fees as necessary to prevent massive customer confusion and complaints.  We later determined that some of the recertifications processing was run in Suite 250 at the Dyer Road site through Receivership Entity Premier Solutions Servicing ("Premier"), a d/b/a of J&L Enterprise, controlled by Individual Defendant Loc Phu.

Having explained their exit from the student loan debt relief space, they asserted that Arete was now entirely focused on the unsecured consumer debt

///

///

///

---

[6]  We found prescription bottles full of pills, mushrooms, a white powder ball, and a gilded money counter at Hsu's desk.  When asked about the desk, Hsu falsely claimed it was Gilani's and went on to say they all "share" the offices.  Based on the other documents and items in the desk, it is Hsu's desk, not Gilani's.

4

settlement business which had also operated from this site.[7]  *See* further discussion of this consumer debt settlement business at Section IV.

Our onsite review has included an investigation of the claim that, except for annual recertification processing, Arete was "out of the student loan business." Our review tells the story that throughout the summer of 2019, Defendants made a deliberate push to separate Arete from the student loan debt relief business, all in an apparent effort to protect Arete.  This push was motivated at least in part by awareness of increasing regulatory pressures.[8, 9, 10]  By July 2019, student loan activity did appear to be primarily limited to recertifications for existing customers.[11, 12]

---

[7]  They explained that Arete had done both student loan debt relief and consumer debt relief from inception in 2017 until the exit from student loans in the summer of 2019.

[8]  Texts in the Whatsapp chat between the five owners make it clear that concerns regarding liability were the primary driver in their decision to exit the student loan business.  In a May 1, 2019 conversation, Palacios stated that they "[n]eed[ed] to cut off SL [student loan] affiliates today if possible."  He emphasized that it "ha[d] to be done," because even though they "gave up 300k a month because of liability with SL," they were "still taking liability by enrolling files for other companies to earn pennies."  Carey Howe responded that "Sye or 1file has to take them," referring to Student Loan Pro (Gilani's company) and their other student loan business, Defendant 1file.org, and showing a clear intent to allocate risk away from Arete and to these two other companies.  *See* Exhibit 3.

[9]  The CFPB's inquiry into Student Loan Pro in August 2019, discussed below, got the attention of Premier's Processing Manager who sent an email to the Processing Department indicating that: "[D]ue to the CFPB cracking down on all these student loan companies, if a client wants a refund then don't tell them that they won't get it.  Just forward it to me and I will take care of it.  We will at least always give them a partial refund.  We want to avoid any complaints and do not need attention on PSS.  Sy's company just got a letter from the CFPB."  *See* Exhibit 4.

[10]  An internal Premier email on June 26, 2019 stated: "we are now Premier Solutions Servicing" and as a result there will be some "additional steps and stipulations."  *See* Exhibit 5.

[11]  We did see some evidence that Premier may have taken some student loan referrals from customers calling into Arete – one Premier employee told such a referral that Premier was Arete's "sister company," Exhibit 6.

[12]  As late as October 2019, Arete personnel continued to directly contact consumers about student loans on the email account slprocessing@aretefinancialfreedom.com.  *See* Exhibit 7.

Our review has confirmed that Defendants' purported "wind down" was hardly comprehensive:

- Defendant Palacios reported that the wind down from student loan debt relief began in July 2019.

- By a Declaration filed on November 13, 2019, Defendant Carey Howe now places the commencement of that wind down at April, 2019.

- Arete is not the only Receivership Entity collecting customer fees for student loans.  Defendants maintained four separate DebtPayPro databases to track their student loan business including the collection of customer fees.  Those four databases were denominated as Arete, Premier, 1file.org ("1File"), and Student Loan Pro.  We have access to three of those databases (Arete, Premier, 1File) – we have not yet accessed the fourth (Student Loan Pro) database.

- We have run reports from these three databases on customer fees for student loan services that cleared during the period April 1, 2019 through Nov 6, 2019.  They total $5.5 million ($2.44 million Arete; $2.5 million 1File; and $489,000 Premier).  *See* Exhibit 8.

Despite efforts to distance Arete from the student loan debt relief business, as of the date of our immediate access, Arete was very much in the student loan debt relief business, directly and indirectly:

- Receivership Entities are processing unlawful advance monthly recertification fees from existing customers which are pure cash flow to Arete with no immediate benefit to customers.

- At the Bolsa Avenue site, where the sign on the door says "Arete Financial," Defendant 1File was processing student loan business generated by an Indian call room under contract with two entities owned by Individual Defendant Jay Singh – American Financial Support Services, Inc. ("American Financial") and US Financial

6

Freedom Center, Inc. ("US Financial").  Approved refunds were paid by Arete.  Employees were paid by 1File.  *See* Sections II.A.2 and II.A.4

- Student Loan Pro, which is selling and processing student loan services from the Sky Park site (where the signage says Premier Solutions Servicing), is owned and controlled by Arete co-owner Syed Gilani who conceals his role through a relative.  Student Loan Pro has received substantial funding from Arete, and its business model tracks the models of Arete and Premier.  *See* Section II.A.3.

Suite 100

Suite 100 is identified on building signage as Arete Financial.  It is outfitted with five individual offices (four occupied by the five owners) and 81 workstations (13 appear inactive).  But for the exterior offices, it is a telemarketing call room.  At our arrival, 63 telemarketers were present.  They were cooperative and completed questionnaires.  Our review of Suite 100 operations has confirmed generally that these telemarketers are handling incoming consumer calls for the consumer debt settlement business, described further at Section IV.

Suite 250

Suite 250 is designated on building signage as "Interest Rate Solutions," which is a d/b/a of Defendant Diamond Choice, Inc., a company controlled by Individual Defendant Palacios.  It is composed of two offices, an IT closet, and 45 workstations each with telephone and computer.

One interior office is equipped with two desks and features a large acrylic sign "Premier Solutions Servicing."  The two employees in this small office continue to process monthly recertification fees and annual recertification applications for existing customers.  There is no escrow of any kind.

///

///

7

The active workstations in Suite 250 outside the Premier office are manned by Customer Service (17) and Settlement (24) personnel for the consumer debt settlement business.

Suite 200

While the building signage listed Suite 200 as "Available," this suite houses operations related to Arete's debt settlement business with 34 cubicles. Approximately 30 employees were onsite at our arrival – most cooperated, completed questionnaires, and reported they worked for the debt settlement business, but none were particularly helpful.[13]  Our review confirmed generally that Suite 200 was occupied by sales and customer service personnel for the debt settlement business.[14]

2.    5772 Bolsa Avenue, Suite 220, Huntington Beach, CA

Defendant 1File[15] operates at this site as a processor of student loan debt relief services, including for customers generated by sales teams connected to American Financial and US Financial, both owned by Individual Defendant Jay Singh who operates from the Walnut Creek, California site.

Signage identifies the tenant as Arete Financial.  The suite is approximately 2,000 square feet with four offices,[16] a breakroom, and 28 workstations (only six were active with telephone and computer).  All employees were cooperative and completed questionnaires.

---

[13]  While the Receiver's team was implementing the TRO, the processing manager sent a text message to Individual Defendant Hsu that the cops were there.

[14]  We did identify very limited documents and directories mentioning student loans, but debt settlement services documents were at every workstation, including the Arete Enrollment Guidelines which specifically excluded student loans.

[15]  1file.org is a d/b/a of CBC Conglomerate LLC which is an entity of Individual Defendant Carey Howe.  We have seen documents that refer to "CBC Conglomerate/La Casa Bonita Investments LLC d/b/a 1file.org."

[16]  These offices were assigned to Mr. Poon as the floor manager and one office each to his two managers – Individual Defendant Anna Howe and Jason Ta – who were not present, and a final office for computer storage.

8

1    At our arrival, five processors and the floor manager (Andy Poon) were

2  present.  All said they worked for Defendant La Casa Bonita or 1File (which they

3  described as the same entity).  Processors said they were paid by 1File.  As to

4  ownership, Mr. Poon said he believed Mike Hsu owned 1File, but that he had also

5  been told by Carey Howe that he owned part of 1File.  Poon also said Mike Hsu

6  had provided him a credit card in the name of his entity MJ Wealth Solutions, a

7  Relief Defendant, to treat 1File employees to lunch.

8    <u>Processing</u>

9    We identified thousands of documents confirming that the operations here

10  relate to processing student loan debt relief services for customers secured by

11  American Financial and US Financial.  Processors used login and financial

12  information obtained by the sales team (and stored in 1File's DebtPayPro system)

13  to apply for student loan adjustments through the federal government's

14  studentloans.gov website.  They also responded to customer questions and

15  complaints, a duty shared with the sales team.  We saw some examples of 1File

16  communications with customers that deceptively portrayed it as the actual servicer.

17  *See* Exhibit 9.

18    <u>Advance Fees</u>

19    American Financial and US Financial new customer packages required

20  customers to consent to disclosure of their information to 1File and to the charging

21  of fees by 1File.  These fees were charged in advance – the new customer package

22  notes that the initial service fee will be refunded if a modification is not secured,

23  confirming that the fee is paid ahead of any result.  *See* Exhibits 10 and 11.

24  Customers were also falsely promised that their funds would be held in a third

25  party trust account, but the trust account provider has confirmed that did not

26  happen.[17]

27  _____

28  [17]  The Receiver's representatives contacted Payment Automation Network ("PAN") and confirmed that PAN had never done business with American Financial or US Financial.  American Financial and US Financial falsely told

9

Refunds

Mr. Poon had discretion to issue refunds (though he usually consulted first with his contact at the sales affiliate) and said he issued refunds by messaging "billings accounting" at Arete.  He did so 5-10 times per week, mainly when a loan modification had been denied or the customer was confused about affiliation with the Education Department or the amount of fees to be applied to the loan balances. Mr. Poon was unable to explain why Arete was issuing refunds if it was not one of the companies generating the sales.

Compliance

We found very little in the way of training manuals, written scripts, or other centralized guidance onsite.  Any such materials that we did locate appeared to be out-of-date.  Mr. Poon confirmed that other than a few documents kept on his computer, there was no centralized guidance – training and policy updates were delivered to processors orally by the managers.

Common Enterprise

Our review of the Bolsa site has confirmed that Defendants La Casa Bonita and 1File were an integrated part of a common enterprise that divided sales and back-office functions amongst different teams but effectively operated as one entity, including use of common contracts with clients, and common management. For example:

- Arete personnel worked with 1File personnel to make adjustments in the loan repayment schedule for an American Financial customers;[18]

///

_____

customers (in new client packages) that PAN would be the third-party account holder.

[18]  On the day this Court entered the TRO (November 4, 2019), Bolsa Avenue floor manager Andy Poon and Ly Phu of Arete discussed via email Phu's request that Poon assist her in changing a client's Stafford Loan repayment schedule.  *See* Exhibit 12.  The client's file reflects that American Financial made the sale in January 2019.  *See* Exhibit 10.

10

- Arete, 1File, American Financial and US Financial used virtually identical service agreements for student loan relief clients;[19]

- 1File personnel referred sales leads to US Financial, *see* Exhibit 15;

- Arete managers Carey Howe and Ruddy Palacios participated in plagiarizing the client trust agreements of PAN in November 2017 (*see* Exhibit 16), after Howe entered into a trial period with PAN, *see* Exhibit 17;

- After this apparent theft of PAN's intellectual property (including its logo), the plagiarized contract was inserted not just into Arete's new client packages, but also those of American Financial and US Financial, with similar typographical errors;[20]

- Each of these entities approached the PAN agreement in the same manner – they did not use PAN as a trust account provider, but to help deceive customers and/or others regarding their trustworthiness and compliance;[21]

  - 1File processed student loan client files for American Financial and US Financial, including interacting with loan servicers and processing charges to clients' credit cards for student loan relief services;[22]

---

[19]  The January 2019 American Financial service agreement (Exhibit 10) differs only in insignificant ways from the service agreement of US Financial (Exhibit 11), 1File (Exhibit 13), and Arete (Exhibit 14).

[20]  For example, the incorrect paragraph break between the word "a" and "court order directing further action" in the seventh paragraph (beginning with "Client's funds are held in the Custodial Account...") appears in both the November 2017 sample plagiarized contract (Exhibit 16) and the January 2019 American Financial contract (Exhibit 10).  *See* Exhibits 10, 11, and 13.

[21]  *See* footnote 17, *supra* at page 9.

[22]  *See* Exhibits 10, 11, and 13.  Based on staff interviews and document review, although 1File was an originating entity at one time, Exhibit 14, but it seems to have stopped.

EXHIBIT A
Page 13

- After processing, 1File transferred customer funds to American Financial and US Financial after deducting its share, which we believe to be one-third.

3.    18001 Sky Park Circle Suites L-M, Irvine, CA

The business here is a student loan debt relief services business – sales and processing – operating as Student Loan Pro under the guidance of Syed Gilani. The Processing Manager advised us that Student Loan Pro has approximately 2,300 customers.

This site is approximately 2,500 square foot with six individual offices and multiple workstations equipped with computers and phones.  Building signage identifies Premier Solutions Servicing as the tenant.  Seven employees were present at our arrival, an eighth arrived later and at least one was absent.  All were cooperative and completed questionnaires.  The highest ranking employees present were the Sales Floor Manager and the Processing Manager.  Both said they reported directly to Syed Gilani, a one-fifth owner of Arete.[23]

Sales

In sales, five employees responded to inbound consumer calls and initiated some outbound calls, but only when provided consumers' names to contact.  They understood that leads were generated by radio ads, but they were not informed as to the overall marketing program or the bigger business model.  Sales materials, including the current script (Exhibit 18), contain deceptive statements, or minimal guidance, leading to customer confusion.  For example:

---

[23]  The Processing Manager said she was hired by Mr. Gilani who had met her at a previous student loan debt relief business job.  Several employees indicated that they, or their relations, had first learned of Student Loan Pro at an addiction rehab center attended and supported by Mr. Gilani.

12

- The script has no directions to explain family size.[24]  Several employees admitted they fudged family size numbers to sell customers lower monthly payments.  We found a chart on one desk with the precise family size needed to obtain a $0 payment plan for each income level – this was a handy tool to guide sales to the family size needed to back into a $0 payment plan.  *See* Exhibit 19.  The Sales Floor Manager said that she (and presumably her team) was unaware that the Department of Education had very precise guidelines for family size calculations.

- The description of fees is vague, generating predictable consumer confusion as to whether fees were applied to loan balances.  *See* Exhibit 18.

- A sales white board posted on the wall instructed employees to tell customers "<u>NOT</u> to contact their servicer, <u>WE</u> will take care of it." *See* Exhibit 20.

Processing/Advance Fees

In Processing, one employee entered data, three conducted verification calls, one worked on "rehab" files and other projects as needed, and one rescheduled NSF payments and addressed chargebacks.

Employees, and the sales scripts, confirmed that fees were processed before the debt relief work was completed and were not placed in any escrow.  The fees generally included $695 upfront (broken into three monthly payments of $231.67) and a recurring monthly charge of $39.

Compliance

Employees indicated they received little to no training on what they could or could not say.  There was no compliance department or oversight of sales

---

[24]  As to family size, this script reads:  "Start filling in client's information (first name, last name, phone number, DOB, annual gross income, family size and state.) Calculate and save."

13

practices.  Interest in compliance did appear to increase, however, in August 2019 after Student Loan Pro received a Civil Investigative Demand from the CFPB.  *See* Exhibit 21.  Employees expressed little surprise when my team entered to implement the TRO – several employees were actually reading about the CFPB's recent case against another Orange County student loan operator.

Common Enterprise

The Student Loan Pro business is closely interconnected to Defendants and part of their common enterprise:

- Student Loan Pro is owned and controlled by Mr. Gilani, a one-fifth owner of Arete.  He did not have an office at Sky Park, but communicated regularly through the Processing Manager.  Employees reported that he did come to the office two to three times a week – some of those visits included the delivery of paychecks.

- Student Loan Pro is funded by Arete and its finances are intermingled. In the first seven months of 2019 alone, Arete transferred nearly $700,000 directly to Student Loan Pro.

- While the Student Loan Pro name is a d/b/a of a company owned by Judith Noh, the managers onsite confirmed she had no involvement. Rather, she and her LLC appear to be a front for the business actually run by Mr. Gilani as part of Defendants' common enterprise.[25]

- Student Loan Pro operates out of space leased in the name of Defendant Premier and signage still identifying Premier as the occupant.[26]

---

[25]  Ms. Noh, who we believe is a relative of Mr. Gilani, is the owner of a company called FNZA Marketing, d/b/a Student Loan Pro.

[26]  Given the suite's Premier signage as well as records located onsite, it was clear that Defendants, led by Individual Defendant Phu, previously operated Premier out of this location.  While Premier moved to the Dyer Road location at some point in 2017, there were still numerous Premier documents and materials located in this suite.  These included Premier scripts, compensation structures, organization

14

- Student Loan Pro's website content is nearly identical in many respects to the Premier website.  The Premier website even refers to Student Loan Pro in its own Terms of Use.[27]
- Student Loan Pro is based on the same business model as Premier (and Arete) and incorporates similar scripts, contracts, and lead generation methods, all paid for by Arete.  Payment protocols were also nearly identical.

4. 500 Ygnacio Valley Road, Suite 430, Walnut Creek CA

This site is the office location of Individual Defendant Jay Singh and his companies American Financial and US Financial.  Signage identifies the tenant as Settlement Corporation of America, but the primary physical operations appear to relate to yet a fourth company, National Consumer Law Group, which operates as a debt relief company.

The site is an office suite of approximately 2,500 square foot in an upscale four-story office complex near Walnut Creek.  It includes seven individual offices[28] and four workstations with telephone and computers.

Defendant Singh runs the student loan debt relief business of American Financial and US Financial by contracting with offshore Indian call rooms to secure customers for student loan relief.  Once the customer is secured, they are referred to 1File for processing, as described above at Section II.A.2.

Three employees were present upon our arrival.  All were cooperative and completed the questionnaire.  Two were customer service staff and one handled the

---

charts, and formation documents.  We also found mail addressed to Defendant J&L Enterprise, which is owned by Defendant Phu.

[27] "By using the Premier Solutions Servicing services or the studentloanpro.org website…, you are entering into a binding contract us.  Your agreement with us includes these Terms and Conditions of Use ("Terms") … [www.studentloanpro.org/toc.php] … Learn more about the Service here [www.studentloanpro.org/toc.php]."  *See* Exhibit 22 (emphasis added).

[28] Individual offices were assigned to Jay Singh and Mandip Purewal.

15

daily client mail, including client debt statements.  All stated they were employed by National Consumer Law Group.  Defendant Jay Singh was not present.  It appears that a total of five people actively work from this site.

1File personnel provided compliance guidance to US Financial, including how to control the "[re]occurring issues with the agent's lies to the clients," (Exhibit 23) advising sales employees not to enroll a client who worked in law enforcement ("Do you really want that liability?") (Exhibit 24) and identifying problems with claiming a family size of 5 or more for borrowers whose tax filing status was single (Exhibit 25); US Financial personnel also described 1File personnel as US Financial's "compliance team."  *See* Exhibit 26.

**B.     Bank Accounts**

Immediately after receiving the TRO, the FTC and the Receiver served the asset freeze on banks and other financial institutions where Defendants were known to maintain accounts.  In the brief time since the TRO was entered, we have received the following information as to frozen accounts:

| Account Name | Fin'l Institution | Acct. No. | Balance Frozen |
|---|---|---|---|
| Arete Financial Group LLC | BofA | 9321 | $186,943.13 |
| Arete Financial Group LLC | BofA | 9334 | $37,194.17 |
| Arete Financial Group LLC Marketing | BofA | 9768 | $377,774.14 |
| Arete Financial Group LLC Settlement Fees / MSS | BofA | 9917 | $25.00 |
| Fusion Graphics | BofA | 0755 | $18,292.46 |
| La Casa Bonita Investments, Inc. | BofA | 2021 | $28.22 |
| La Casa Bonita Investments, Inc. | BofA | 8770 | $98,642.75 |
| La Casa Bonita Investments, Inc. | BofA | 8783 | $4,202.96 |
| La Casa Bonita Investments, Inc. | BofA | 5674 | $221.77 |
| MJ Wealth Solutions, LLC | BofA | 9274 | $3,378.03 |
| US Financial Freedom Center, Inc. | BofA | 3863 | $5.19 |

| Account Name | Fin'l Institution | Acct. No. | Balance Frozen |
|---|---|---|---|
| US Financial Freedom Center, Inc. | BofA | 8299 | $694.29 |
| **TOTAL** | | | **$727,402.11** |

Debt Pay Gateway, Inc., a third-party account management company which receives, holds, and disburses funds on behalf of Arete's debt settlement customers, is currently holding approximately $5.3 million for the benefit of 7,778 customers.  On November 7, 2019, the FTC and Debt Pay Gateway agreed that those funds could continue to be disbursed to creditors in accordance with the customer's debt settlement agreements.

**C.      Documents/Information/Electronic Data**

After taking possession of the four sites, we confirmed that the hard copy documents were secure.  For the electronic documents and data, we retained a computer forensic firm to supervise the FTC's Digital Forensics Unit who assisted and obtained forensic images of certain selected desktop computers at the three Southern California sites.

While Receivership Entities employed more than 140 employees, instead of utilizing a business grade email system, Defendants purchased multiple copies of Microsoft Office 365 Home at a cost of $100 per year for six users.  As a result, there is no centralized location to collect Receivership Entities' emails and computer forensics professionals were required to collect emails from each individual computer.[29]  Since this was extremely labor intensive, we directed the computer forensics professionals to only forensically image or collect emails from

---

[29]  In September 2019, the five owners, using management@aretefinancialfreedom.com, sent an email to all employees instructing them to delete all 2018 emails, empty the Outlook trash folder, and delete emails that are not needed on a daily or weekly basis because purportedly the company was running low on disk space.

17

certain computers.  The computers remain preserved at the four receivership sites if any party wishes to obtain a forensic image.

Defendants also utilized Intuit QuickBooks Online for accounting and DebtPayPro for their customer relationship management database (CRM).  After we provided notice of the TRO to DebtPayPro, they suspended access to the CRM accounts.  We have since provided the Arete Defendants and the FTC read-only access to those DebtPayPro accounts.[30]

**D.     Accounting**

Our forensic accountant, Lisa Jones, is in the process of reviewing available financial records, which include QuickBooks records, bank statements, and merchant account statements.  Based on the information available to date, she has prepared a Receivership Initial Account Records Review report attached as Exhibit 27.  We have as a start point the declaration of the FTC's forensic accountant (Roshni Agarwal) that consumers paid a total of $43 million to Defendants for student loan debt relief services during the period July 2014 to May 2019.  We have also identified accountants who have provided bookkeeping and tax preparation services for Receivership Entities in the past.  We will follow up with them to secure relevant records and tax returns.

**E.     Vehicles**

During initial entry at the Dyer Road site, the Receiver identified a brand new 2020 BMW 750i sedan leased to Receivership Entity La Casa Bonita Investments parked out front.  Carey Howe confirmed that the vehicle was leased by the Receivership Entity and turned over the keys to the Receiver.  After several

---

[30]  Arete Defendants' discussion of their requests to my office includes an inaccurate timeline.    *See* Opp., pages 10-11.  Defense counsel first contacted the FTC and me on Friday, November 8 and asked for a call the following day, which we joined.  It was not until Monday (Veterans Day), at 2:45 p.m. that Defendants made their first request to my office.  At 8:00 p.m. I responded, offering login access and agreeing to provide materials as soon as possible.  My team reached out at 9:30 p.m. to request information necessary to provide login access to DebtPayPro and, again, the following morning at 9:07 a.m. and at 9:51 a.m. we had the DebtPayPro access established.

18

1  additional demands to return all vehicles titled or leased by the Receivership

2  Entities, on November 8, 2019, Mike Hsu, Oliver Pomazi a/k/a Loc Phu, and

3  Carey Howe turned over a leased 2019 Lamborghini Urus SUV, a leased 2018

4  Mercedes G63 SUV, a 2020 Rolls-Royce Cullinan SUV, and two 2018 Toyota

5  RAV4 SUVs.  These vehicles have been placed in a secure indoor storage facility

6  pending the resolution of the Preliminary Injunction hearing.

7  ### III.

8  ### DEFENDANTS' STUDENT LOAN DEBT RELIEF BUSINESS

9  Our review of Defendants' student loan debt relief operations at each site

10  has confirmed the collection of unlawful advance fees and deceptive sales

11  representations prohibited by the TRO.  As authorized by the TRO, Section XII.T,

12  I have suspended the student loan debt relief operations at each site based on my

13  determination that such operations cannot be continued lawfully and profitably.

14  **A.    Unlawful Advance Fees**

15  Defendants' acceptance of advance fees in violation of the Telemarketing

16  Sales Rule dooms their student loan debt services business.  The requesting or

17  receiving of such advance fees renders the business unlawful.

18  Consumer payments for Defendants' services have been and continue to be

19  collected long before the work has been completed or the customer has made a first

20  payment on a new renegotiated plan.  Hence, these fees are unlawful and

21  prohibited by the Telemarketing Sales Rule (16 C.F.R. § 310, "TSR").  The rule

22  prohibits requesting or receiving payment of any fee unless and until (A) the

23  telemarketer has settled at least one debt pursuant to an agreement executed by the

24  customer, and (B) the customer has made at least one payment pursuant to that

25  agreement.  There is an escrow exception, but it is not at issue here because these

26  Defendants did not deploy any escrow or trust accounts for student loan debt relief

27  customers.

28  ///

19

Fees were collected in advance.  The standard fee structure required an upfront fee (generally paid in three equal monthly installments) and a recurring monthly recertification service fee for the annual application required by most repayment plans.  These fees created residual monthly cash flow for Defendants with no immediate benefit to the customer and were paid out well before the annual recertification application was actually prepared or even due.

**B.      Defendants' Sales Pitch Incorporates Prohibited Misrepresentations**

Given that the presence of advance fees strikes a fatal blow to the lawfulness of these businesses, protracted review of the underlying sales practices is not necessary to reach an overall conclusion as to lawfulness.  But, our review of scripts, training materials, and sales directives provided confirmation that deceptive representations are ingrained in the business.  Our review of complaints has confirmed Defendants routinely deployed deceptive sales practices, resulting in customers complaints and confusion.  For example:

- A June 28, 2019 internal email from account Billing@aretefinancialfreedom.com to Defendant Phu transmitted a customer complaint that the company is "a fraud" and a "rip-off."  *See* Exhibit 28.

- A March 2019 email from Defendant Phu to the entire Arete processing team, states that "We are getting a complaint every single day" and begging people to get on the phone to "get us good reviews."  *See id.* at page 162;

- Where customers threatened to go to the regulators, Defendants promptly offered full refunds.  In May 2019, Defendant Carey Howe instructed his wife, Defendant Anna Howe, who handled consumer complaints for 1File: "Refund and squash it," in response to a consumer who was threatening to report 1File to the CFPB.  *See id.* at page 163;

20

- There have been numerous BBB consumer complaints in the last couple of months alone about Defendant 1File, including common themes of customer confusion about where payments are being applied, questions about why loan amounts are rising, and assertions that the customer was lied to and "scammed." *Id.* at pages 164-168;
- Customers also directly emailed 1File, with similar complaints. *Id.* at pages 169-173;
- On November 4, 2019, a consumer complained to Premier: "At no time was I told that the 1st 3 months payment was a fee to you. . . ." *Id.* at page 175;
- In May 2019, Premier employees internally discussed a complaining consumer's concerns, writing "I hope she knows that it's the processing fee she's paying and not towards her loans[.] *Id.* at page 178;
- In February 2018, Premier provided a full refund but in doing so required of the customer: "Please confirm that you have not already submitted a complaint to the CFPB." *Id.* at page 182;

**C.    Common Enterprise**

Our review of operations at the various sites has confirmed that Receivership Entities have engaged in the student loan debt relief business as a common enterprise.  The site-specific descriptions above confirm the reality of:  common ownership and control; common locations and shared offices; each business is projected as virtually identical to consumers; business names and d/b/as are interchanged; shared business models with nearly identical forms and pricing; personnel maintained email accounts at multiple domains; and commingling of funds.

///

///

21

**IV.**

**DEFENDANTS' CONSUMER LOAN DEBT SETTLEMENT BUSINESS**

As reported above, my review of operations has indicated that the current active operations at the Dyer Road site in Santa Ana are principally, but most certainly not exclusively, related to the consumer debt settlement business of Arete. Defendants have described the business as financial services for consumers with unsecured debt. *See* Ruddy Palacios Declaration in support of preliminary opposition to OSC filed November 13, 2019 (ECF No. 49-3).

We reviewed onsite materials to verify the basic nature of this business, including sales scripts, employee manuals, and training materials. The debt settlement business revealed in this review is a different business than student loan debt relief with different types of creditors and consumer debtors with multiple debts seeking debt settlement or debt resolution. The internal processes include sales, settlement, and customer service.

This discovery raises the question of whether my authority as Receiver extends beyond the student loan debt relief business to the consumer debt settlement business. I must conclude that it does not.[31]

To be clear, I make no determination of any kind as to the lawfulness of the debt settlement aspect of Arete's business – I simply do not believe that the TRO extends my authority and duties as Receiver to that business. But, that business is

---

[31] The subject of the TRO appointing me Receiver is student loan debt relief services:

- Finding of Fact B (TRO, page 1) recites the misrepresentations about the nature of the student loan debt relief services and the charging of unlawful upfront fees for their services.

- Finding of Fact C (TRO, page 2) includes an express finding that "the FTC has established a likelihood of success in showing that Defendants have made deceptive representations in the marketing and sales of student loan debt relief services and collected unlawful advance fees from consumers."

- The "Prohibited Business Activities" section (Section I, pages 5-6) identifies four specific misrepresentations as to consumer student loans and the requesting or receiving of advance fees.

22

interconnected to, and has incorporated the revenues from, student loan debt relief business of Arete and other Defendants[32] and its operations have incorporated the systems and infrastructure now based at the Dyer Road site.

The question then becomes how does the Receiver proceed, consistent with the duties assigned by the TRO to preserve Documents and Assets of Receivership Entities who have operated, and continue to operate, an unlawful student loan business as a common enterprise.[33]  In order to fulfill my multiple duties to take custody, control, and possession of Receivership Entities' Documents and Assets and to preserve their value, I shall continue to maintain exclusive control of the Dyer Road site.  As provided in the TRO (Section XII.V), I will provide Defendants and their representatives reasonable access to the premises for the limited purpose to inspect and copy books, records, documents and other property.

If the Arete Defendants wish to continue their consumer debt settlement business – sans the Receivership Entities' Documents and Assets – the TRO does not appear to prevent them from doing so.[34]  But, to operate the debt settlement business from the Dyer Road site, Defendants would necessarily make use of Documents and Assets (equipment, furniture and systems) belonging to

///

///

---

[32]  Including the roughly $2,447,000 in student loan fees collected by Arete since it supposedly exited the student loan business in April 2019.  Defendants Arete, 1File, and Premier, in the aggregate, collected $5,500,000 during the same period, April 1, 2018 through November 6, 2019.

[33]  Those duties include:  take exclusive custody, control, and possession of all Assets and Documents of any Receivership Entity (Section XII.B); conserve, hold, manage, and prevent the loss of all Documents and Assets of the Receivership Entities, and perform all acts necessary or advisable to preserve Assets and Documents (Section XII.D and E); and take all steps to secure and take exclusive custody of each location from which the Receivership Entities operate (Section XII.H).

[34]  I understand that the parties may disagree with this analysis.  Given that a Receiver acts as an agent of the Court, I am available to review this matter with the Court as it may deem appropriate.

23

1  Receivership Entities.  Such use would put at risk the integrity of the Documents

2  and the value of the Assets.[35]

3      Our review has raised multiple red flags about the potential for these

4  Defendants to dissipate assets.  Their business is operated through a Byzantine

5  network of entities many with individual ownership interests held by other entities

6  or individuals as fronts.  Our financial review has identified a long history of intra

7  company transfers in the millions of dollars and extravagant expenditures for the

8  personal benefit of the Individual Defendants.  While my review of operations is

9  still in its preliminary stages, these realities highlight the criticality of my duties as

10  Receiver to protect and preserve the Assets and Documents of the Receivership

11  Entities.

12  Dated:  November 14, 2019          By:   /s/ Thomas W. McNamara

13                                         Thomas W. McNamara
                                          *Temporary Receiver*

14

15

16

17

18

19

20

21

22

23

24

25

26

27  [35]  Moreover, the Arete Defendants would need to attract third party capital to
continue operations.  The presently frozen Receivership Entity funds are a mere
28  fraction of the alleged $43 million in consumer harm.

24