Thomas H. Bienert, Jr., State Bar No. 135311
tbienert@bienertkatzman.com
Ariana Seldman Hawbecker, State Bar No. 190506
ahawbecker@bienertkatzman.com
Ali Matin, State Bar No. 268452
amatin@bienertkatzman.com
BIENERT | KATZMAN PC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile:  (949) 369-3701

Attorneys for Defendants
Carey G. Howe, Ruddy Palacios,
Shunmin Hsu, and Oliver Pomazi

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>    Plaintiff<br><br>v.<br><br>AMERICAN FINANCIAL SUPPORT SERVICES INC., et al.<br><br>    Defendants | Case No. SACV 19-02109 JVS (ADSx)<br><br>Assigned to Hon. James V. Selna<br>Courtroom 10C<br><br>**ARETE INDIVIDUALS' OPPOSITION TO *EX PARTE* APPLICATION BY RECEIVER FOR ORDER APPROVING AND CONFIRMING SALE OF RECEIVERSHIP ENTITY'S DEBT SETTLEMENT ACCOUNTS; DECLARATION OF ARIANA HAWBECKER IN SUPPORT** |

# TABLE OF CONTENTS

I.    INTRODUCTION. ................................................................................................. 1

II.   STATEMENT OF RELEVANT FACTS.................................................................. 4

    A.    The FTC's claims center on alleged improper conduct associated with Arete's student loan debt relief services only. ......................................... 4

    B.    The FTC's TRO/PI Application did not seek a receiver to sell assets and the Court did not address, let alone consider, authority for the Receiver to sell the Debt Settlement Business. ................................................ 5

    C.    The Receiver reported alleged improprieties with Arete's student loan services to the Court, not the Debt Settlement Business, and he claimed to lack authority over that separate business. ................................... 6

    D.    Despite acknowledging that his authority does not extend to the Debt Settlement Business, the Receiver has not allowed the Arete Individuals to operate that business and now seeks to sell that business. .............................................................................................................. 8

III.  THE COURT SHOULD DENY THE APPLICATION BECAUSE THE SALE OF THE DEBT SETTLEMENT BUSINESS IS BEYOND THE SCOPE OF THE PRELIMINARY INJUNCTION AND THE RECEIVER'S AUTHORITY; ITS OPERATIONS SHOULD INSTEAD BE RETURNED TO THE ARETE INDIVIDUALS................................................ 9

    A.    As explained by *Kutzner*, the Receiver should not be permitted to sell assets before any final adjudication on the merits because it is inconsistent with the preliminary injunction and will cause irreparable harm .......................................................................................... 10

    B.    The Receiver seeks approval of the sale under 28 U.S.C. § 2004, but he does not cite that provision in his brief, let alone satisfy its strict requirements. ......................................................................................... 12

    C.    Now that the Receiver has secured records concerning Arete, and given the absence of any evidence or allegations concerning materially deceptive conduct in Arete's Debt Settlement Business, control should be returned to the Arete Individuals..................................... 13

IV.   CONCLUSION.................................................................................................. 15

# TABLE OF AUTHORITIES

Cases

*Exch. Comm'n v. Lincoln Thrift Ass'n,*
   577 F.2d 600 (9th Cir. 1978)..............................................................9
*Exch. Comm'n v. Schooler,*
   2016 WL 3031824 (S.D. Cal. May 25, 2016) ....................................9
*Fed. Trade Comm'n v. Kutzner,*
   2017 WL 5188334 (C.D. Cal. Mar. 10, 2017)................................1, 10, 11, 12
*NAVEX Glob., Inc. v. Stockwell,*
   2019 WL 6312558 (D. Idaho Nov. 25, 2019).....................................9
*Regents of Univ. of California v. Am. Broad. Companies, Inc.,*
   747 F.2d 511 (9th Cir. 1984) ...............................................................9
*Sec. & Exch. Comm'n v. Capital Consultants, LLC,*
   397 F.3d 733 (9th Cir. 2005) ...............................................................9
*Sec. & Exch. Comm'n v. Hardy,*
   803 F.2d 1034 (9th Cir. 1986) .............................................................9
*Zepeda v. U.S. I.N.S.,*
   753 F.2d 719 (9th Cir. 1983) ...............................................................9

Statutes

15 U.S.C. § 45 ........................................................................................11
28 U.S.C. § 2001 ....................................................................................13
28 U.S.C. § 2004 ................................................................................3, 12

## I. Introduction.

The Receiver's[1] Application[2] seeks to sell the debt settlement service business accounts ("Debt Settlement Business") of Arete Financial Group LLC ("Arete") to a third party.[3]  His Application should be denied and the operation of Arete's Debt Settlement Business should be returned to Arete's majority owners, defendants Palacios, Howe, and Hsu because that business is not part of the FTC's Complaint.

The Receiver  claims that the preliminary injunction order appointing him gives him the right to sell the Arete Individuals' property interests.[4]  It does not, as explained to this Receiver by another court in this district in the context of a similar FTC enforcement action, *Fed. Trade Comm'n v. Kutzner.*[5]

*First*, and most importantly, the Debt Settlement Business is ***not the subject of this FTC enforcement action***.  The Complaint and accompanying requests for temporary restraining order and preliminary injunction rest *exclusively* on allegations that the named defendants operated ***student loan debt relief services companies*** that made misrepresentations to consumers and unlawfully collected upfront fees.  Arete had shut down its student loan website and marketing and largely exited this business well before the FTC action was initiated, shifting its business to helping consumers negotiate down

---

[1] The "Receiver" is Thomas McNamara.
[2] The "Application" is the *Memorandum of Points and Authorities in Support of Ex Parte Application by Receiver for Order Approving and Confirming Sale of Receivership Entity's Debt Settlement Accounts*, Dkt. No. 95-1.
[3] Appl. 1:4-9.
[4] Appl. 1:21-2:5.
[5] 2017 WL 5188334 (C.D. Cal. Mar. 10, 2017) (O'Connell, J.).

their personal debt.[6]   The Complaint does ***not*** allege wrongdoing in the operation of Arete's separate and distinct Debt Settlement Business.[7]

Because the FTC's Complaint and restraining order papers offer no evidence of violations within the purview of the FTC by Arete's Debt Settlement Business—or an operational connection to other corporate defendants running student loan services—it should not be sold; instead, the Arete Individuals should be permitted to operate it.

Indeed, the Receiver admitted in his initial report to the Court that he did not believe his authority extended to Arete's Debt Settlement Business and concluded that "[i]f the Arete [Individuals] wish to continue their consumer debt settlement business . . . the TRO does not appear to prevent them from doing so."  However, after entry of the preliminary injunction ("PI"), the Receiver inexplicably reversed himself and asserted authority over the Debt Settlement Business, even though the language of the PI is materially indistinguishable from the temporary restraining order ("TRO") preceding it.[8]  Despite his sudden change of heart, the Receiver's initial reasons for disclaiming authority over the Debt Settlement Business, as described in his report to the Court and discussed below, remain unchanged.

---

[6] *See* Dkt. No. 75 at 7-8; *see also* Dkt. No. 49 at II.F-G. and Dkt. No. 49-1, ¶¶5-7. In fact, approximately 90% of Arete's workforce was dedicated to serving the Debt Settlement Business.  Dkt. No. 49-3, ¶ 4 (noting that 143 of Arete's 150 employees worked on debt settlement).

[7] Arete's Debt Settlement Business consisted of 7,778 accounts holding approximately $5.3 million in customer funds.  Appl. 3:20-21.

[8] The Receiver's unwillingness to hand over control of the Debt Settlement Business, as he originally suggested, to the Arete Individuals who are in the best position to maintain the accounts of Arete's  debt settlement clients with funds in Debt Pay Gateway apparently stems from pressure from the FTC.  Despite the Complaint being bereft of any allegations concerning the Debt Settlement Business, the FTC seeks to prevent the Arete Individuals from operating any business that could allow them to support their families and earn income that could be used to fairly litigate this action.  That is, the FTC knows that with the Arete Individuals' assets frozen, it can extract whatever result it wants and that allowing them to earn income through operation of a separate business would level the litigation playing field. The FTC should not be permitted to dispense with due process for their convenience.

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Second*, as explained by *Kutzner*, "the role of a preliminary injunction in the litigative process counsels against authorizing the sale" of the Debt Settlement Business because "[t]he purpose of [a] preliminary injunction is to maintain the status quo between the litigants pending final determination of the case."  Like *Kutzner*, "[n]either the Receiver nor the [FTC] has met their burden of establishing how selling the Subject Property . . . ***prior to any determination of liability*** . . . maintains the status quo."  Rather, as *Kutzner* explains, "selling the Subject Property would upset the status quo" and place the Arete Individuals "in a significantly different position than prior to the start of this litigation by . . . ***stripping them of their ownership interest in their assets***" and causing them irreparable harm.

The *Kutzner* court refused to inflict irreparable harm to the defendant by allowing the sale of assets "***before a defendant's liability ha[d] been determined***" because "a sale would contravene a preliminary injunction's purpose in maintaining the status quo."  The Receiver's attempt to sell the Debt Settlement Business is even less justifiable than his attempt to sell property in *Kutzner*.  Here, there is no evidence, let alone allegations, that any of Arete's Debt Settlement Business customers were subject to up-front fees or that Arete engaged in a pattern of deceit towards those customers.  Thus, there is no basis to deprive the Arete Individuals of their property interests in Arete's Debt Settlement Business.

*Finally*, the Receiver fails to address 28 U.S.C. § 2004 ("Section 2004"), let alone satisfy it. This statute sets out several requirements before a receiver is permitted to sell property.  Among other things, (i) a receiver must seek appointment of three disinterested appraisers to value assets, (ii) the assets must be sold at more than two-thirds of the appraised value, (iii) the sale terms must be published in a newspaper, and (iv) there must be an overbid procedure process.  The Receiver has not complied with any aspect of Section 2004.  Indeed, the Application contains no reference to the statute at all.  Yet the Receiver's proposed sale order contains a finding invoking Section 2004 and implying that the Receiver complied with the statute, even though he has taken no steps to obey the law.  The Receiver's failure to follow Section 2004 is reason, in and of itself, to deny the Application.

The Receiver's willingness to sell Arete's Debt Settlement Business, and, more notable, the FTC's non-opposition to that sale confirms the absence of evidence that Arete's Debt Settlement Business clients were procured by deceit. As such, the Court should reject the Application and confirm that the Receiver should return Arete's Debt Settlement business to the Arete Individuals.

## II.    Statement of relevant facts.

### A.    The FTC's claims center on alleged improper conduct associated with Arete's student loan debt relief services only.

The FTC's Complaint and companion requests for the TRO and PI target alleged improper conduct associated with various student loan debt relief services business. They do **not** include any factual allegations pertaining to Arete's separate and distinct Debt Settlement Business.

The Complaint centers on a purported common enterprise the FTC calls a "Deceptive Student Loan Debt Relief Scheme," including both misrepresentations and the collection of upfront fees for assisting consumers in managing student loan debt. Dkt. No. 1, Compl. ¶¶ 24-47. Not a single allegation in the Complaint contains any specific reference to Arete's separate Debt Settlement Business.

Similarly, when the FTC moved the Court for a TRO and PI (the "TRO/PI Application"),[9] it presented no evidence establishing that the Debt Settlement Business was unlawfully operated. Instead, the declarations the FTC submitted in support of the TRO/PI Application came from purported Arete student loan service customers. *See* Dkt. Nos. 26–30 (Exhibits to Plaintiff's TRO Application Volume I–V).

Given the distinction between the student debt services business and the Debt Settlement Business, the Receiver, by his own admission, "concluded that the debt

---

[9] The "TRO/PI Application" is a reference to the FTC's *Memorandum of Points and Authorities in Support of Plaintiff's Ex Parte Application for Temporary Restraining Order, Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue*, Dkt. No. 2-2.

OPPOSITION TO *EX PARTE* APPLICATION

settlement business *was a different business* than the student loan debt relief business expressly identified in the TRO." Appl. 2:11-12 (emphasis added).

**B. The FTC's TRO/PI Application did not seek a receiver to sell assets and the Court did not address, let alone consider, authority for the Receiver to sell the Debt Settlement Business.**

In its TRO/PI Application, the FTC requested that the Court appoint a Receiver to determine whether a preliminary injunction is appropriate, secure Arete's business premises, and preserve records—*i.e.*, relief that is, at least facially, consistent with maintaining the status quo:

> A receiver would secure Defendants' premises and business records, ensure compliance with the law and the Court's orders, and perform other necessary business functions like identifying and managing assets, performing an accounting, preserving documents, and determining whether the companies can operate lawfully.
>
> ***
>
> Here, there is a high risk that, if the receiver cannot immediately access the corporate Defendants' premises and secure their records, the corporate Defendants will destroy, or render inaccessible, critical evidence.

Dkt. No. 2-2, TRO/PI Appl. 28:13–19, 29:8–10. Nowhere in the TRO/PI Application did the FTC state that the Receiver could dramatically alter the status quo by selling the Debt Settlement Business and stripping the Arete Individuals of their property interests in this separate business.[10]

Likewise, when the Court entered its decision granting the TRO/PI Application ("PI Decision"), it did not provide authority for the Receiver to sell the Debt Settlement

---

[10] Defendants Palacios, Howe, and Hsu together own a controlling interest in Arete. *See* Dkt. 49-4, ¶2, incorporated herein by reference.

Business, but rather contemplated that the Receiver would prevent the dissipation of property, mirroring the arguments the FTC made in support of the Receiver's appointment:

> Here the Court finds that it is appropriate to appoint a receiver given that there is evidence that . . . Defendants operate their business under various names, addresses, and telephone numbers thereby increasing the ease of Defendants to **move their property without notice**.

Dkt. No. 75, Order p.18 (emphasis added).  There are no findings or conclusions granting, let alone discussing, any authority for the Receiver to sell the Debt Settlement Business and the irreparable harm the Arete Individuals would experience because of a sale.

Rather, the PI Decision relies on the FTC's evidence and arguments that the named defendants engaged in improper student loan debt relief services.  Dkt. No. 75, Order pp. 7-8.  The Court held that, despite the Arete Individuals' evidence that they had been winding down their student loan business, Arete's recertification fees for consumers who were previously enrolled in Arete's student loan debt services provided a basis to grant the FTC's requested relief.  *Id*. at 8, 14.  Indeed, the PI Decision contains no findings of fact concerning purported misrepresentations regarding the Debt Settlement Business; rather, it states only that the proceeds of the Debt Settlement Business were comingled with proceeds from Arete's student loan services.  *Id*. at 16-17.

**C.    The Receiver reported alleged improprieties with Arete's student loan services to the Court, not the Debt Settlement Business, and he claimed to lack authority over that separate business.**

Following his initial evaluation of Arete's business and operations, the Receiver confirmed that Arete had shifted its focus from student loans to consumer debt settlement (noting that the wind down of the former business was incomplete).  Dkt. No. 57-1, Preliminary Report of the Temporary Receiver ("Receiver's Report") at 6:3-10.  Moreover, the Receiver stated:

6

> Because the express terms of the TRO are limited to the student loan debt relief business, I make no determination as to the lawfulness of the debt settlement business, except I have determined I must maintain exclusive control over the Dyer Road site as necessary **to protect the Documents and Assets of the Receivership Entities**.

*Id.* at 4:3-7 (emphasis added).  Thus, by his own admission, the Receiver understood the scope of his authority was limited based on the very language of the TRO.

Moreover, the Receiver disclaimed any authority over the Debt Settlement Business, stating unequivocally, "I simply do not believe that the TRO extends my authority and duties as Receiver to that [debt settlement] business."  *Id.* at 22:19-20.  In reaching this conclusion, the Receiver pointed to the findings of the TRO appointing him, which focused on the student loan services, not the Debt Settlement Business, stating:

- "Finding of Fact B (TRO, page 1) recites the misrepresentations about the nature of the student loan debt relief services and the charging of unlawful upfront fees for their services."

- "Finding of Fact C (TRO, page 2) includes an express finding that 'the FTC has established a likelihood of success in showing that Defendants have made deceptive representations in the marketing and sales of student loan debt relief services and collected unlawful advance fees from consumers.'"

- "The 'Prohibited Business Activities' section (Section I, pages 5-6) identifies four specific misrepresentations as to consumer student loans and the requesting or receiving of advance fees."

Dkt. No. 57-1, Receiver's Report at n.22.[11]

The Court's Order for *Preliminary Injunction with Asset Freeze, Appointment of*

---

[11] Notably, like the Complaint, the Receiver's Report contains no details establishing that the Debt Settlement Business operated unlawfully or in a manner harmful to consumers.  It is instead focused on allegations regarding student loan debt relief operations.

7

*Receiver, and Other Equitable Relief* ("PI Order"),[12] which followed the PI Decision, contains the **same** findings relied on by the Receiver to conclude he lacked authority over the Debt Settlement Business.  *Compare, e.g.,* Dkt. No. 79, PI Order (Prohibited Business Activities at Section I) *with* Dkt. No. 41, TRO (Prohibited Business Activities at Section I). Yet, without explanation, the Receiver has dramatically altered his reading of the PI Order and scope of his authority.

> **D.    Despite acknowledging that his authority does not extend to the Debt Settlement Business, the Receiver has not allowed the Arete Individuals to operate that business and now seeks to sell that business.**

The Receiver initially acknowledged that he lacked authority over the Debt Settlement Business and invited the Arete Individuals to run that business, stating: "If the Arete [Individuals] wish to continue their consumer debt settlement business—sans the Receivership Entities' Documents and Assets—the TRO does not appear to prevent them from doing so."  Dkt. No. 57-1, Receiver's Report at 23:13-15.  Initially, the Arete Individuals were prevented from running that business because the Receiver maintained control of the premises and everything inside of it.[13]  Moreover, even when the Arete Individuals said they would seek third party financing and to run the business from a different location, the Receiver decided he would not allow for a transfer of the management of that business.  Declaration of Hawbecker ("Hawbecker Decl."), ¶¶ 1-4 **Exs. 1-2**.

Even though the Receiver acknowledged his lack of authority over the business, and despite no intervening authority, the Receiver now claims that he does, in fact, have authority to sell the Debt Settlement Business.  He provides no explanation for this change in position.  *See generally* Dkt. No. 95-2, Declaration of Thomas W. McNamara.

---

[12] *See* Dkt. No. 79.

[13] *See* Dkt. No. 57-1, Receiver's Report at 23:15-24:2 ("to operate the debt settlement business from the Dyer Road site, [the Arete Individuals] would necessarily make use of Documents and Assets (equipment, furniture and systems) belonging to Receivership Entities" and "[s]uch use would put at risk the integrity of the Documents and the value of the Assets").

OPPOSITION TO *EX PARTE* APPLICATION

1
2
3

**III.    The Court should deny the Application because the sale of the Debt Settlement Business is beyond the scope of the preliminary injunction and the Receiver's authority; its operations should instead be returned to the Arete Individuals.**

4
5
6
7
8
9
10
11
12
13
14
15

"The Receiver acts as an officer of the Court, and the Court is tasked with supervising the equity receivership and determining the appropriate action to be taken in the administration of the receivership." *Sec. & Exch. Comm'n v. Schooler*, 2016 WL 3031824, at \*4 (S.D. Cal. May 25, 2016).  Accordingly, "a district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *Sec. & Exch. Comm'n v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (alteration omitted).  *Sec. & Exch. Comm'n v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978) ("the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership").  "The basis for this broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions." *Sec. & Exch. Comm'n v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986).

16
17
18
19
20
21
22

"A preliminary injunction's basic function is to preserve the status quo ante litem pending a determination of the action on the merits."  *NAVEX Glob., Inc. v. Stockwell*, 2019 WL 6312558, at \*2 (D. Idaho Nov. 25, 2019) (internal quotations omitted); *see also Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 728 n.1 (9th Cir. 1983) ("A preliminary injunction can only be employed for the 'limited purpose' of maintaining the status quo.").  "Status quo" is "the last, uncontested status which preceded the pending controversy."  *Regents of Univ. of California v. Am. Broad. Companies, Inc.*, 747 F.2d 511, 514 (9th Cir. 1984).

23
24
25
26
27
28

Here, neither the TRO/PI Application nor the PI Decision issuing a preliminary injunction contemplate, let alone provide, authority for the Receiver to sell the Debt Settlement Business.  Indeed, the Receiver himself concluded that he had no authority over the Debt Settlement Business in his report to the Court.  Allowing the sale of the Debt Settlement Business goes well beyond any effort to preserve records, prevent asset dissipation, and maintain the status quo—the intended function of the Receiver in the

9

context of the preliminary injunction—and would irreparably harm the Arete Individuals.

Regrettably, the Receiver in this case has attempted to sell assets outside the scope of his authority before, but his efforts were rejected in *Fed. Trade Comm'n v. Kutzner*, 2017 WL 5188334 (C.D. Cal. Mar. 10, 2017).  That case is instructive here.

**A.    As explained by *Kutzner*, the Receiver should not be permitted to sell assets before any final adjudication on the merits because it is inconsistent with the preliminary injunction and will cause irreparable harm.**

In *Kutzner*, as here, the FTC filed a complaint under seal, followed by an application seeking preliminary injunctive relief, an asset freeze, the appointment of a receiver, and limited expedited discovery.  *Kutzner*, 2017 WL 5188334 at *3.  Following his appointment in the *Kutzner* matter, the Receiver sought to sell a residence owned by the defendant through a separate entity. *Id* .at *4.  The Receiver argued, as he does here, that "the terms of the preliminary injunction allow[ed] the Court to authorize such a sale because [the preliminary injunction order] require[d] the Receiver to 'perform all acts necessary or advisable to preserve the value of those Assets, in order to prevent any irreparable loss, damage, or injury to consumers.'"  *Id*.  The defendant opposed the Receiver's effort to sell his home.  *Id*.

The court denied the Receiver's request because, among other things, the Receiver's conduct would run afoul of the purpose for the preliminary injunction and irreparably harm the defendant.

*First*, the court noted that the FTC's lawsuit was an "enforcement action[] . . . in which liability has yet to be determined and there remains significant factual disputes as to a defendant's liability."  *Id*. at *5.

*Second*, the Court found "that the role of a preliminary injunction in the litigative process counsels against authorizing the sale."  *Id*.  While "[t]here is no doubt that the court ha[d] the authority to authorize the receiver to sell a receivership estate's assets upon the entry of a final judgment, permanent injunctive relief, or upon the settlement of the parties," ***none of those events had yet occurred***.  *Id*.  As the court explained, "[t]he purpose of [a]

preliminary injunction is to maintain the status quo between the litigants pending final determination of the case." *Id*. at *5-6. And "[n]either the Receiver nor the [FTC] ha[d] met their burden of establishing how selling the Subject Property . . . prior to any determination of liability . . . maintains the status quo." *Id*. at *6. Rather, the court stated, "selling the Subject Property would upset the status quo as it would place Defendant [] and his family in a significantly different position than prior to the start of this litigation by removing them from their home and ***stripping them of their ownership interest in their assets***." *Id*. at *6 (emphasis added). Moreover, a sale "would place the Receivership Estate in a different position by changing the form of the assets held in the Receivership Estate." *Id*. Consequently, the court held that "authorizing the Receiver to sell the Subject Property [or other assets in the Receiver's application] . . . would not maintain the status quo and is not contemplated under the law guiding preliminary injunctions." *Id*.

*Finally*, the court held that it had "not found [] any binding authority indicating . . . that the Receiver ha[d] the authority to sell property held in the Receivership Estate under the terms of a preliminary injunction in an enforcement action ***before a defendant's liability ha[d] been determined***," and "a sale would contravene a preliminary injunction's purpose in maintaining the status quo." *Id*. (emphasis added).

The analysis is no different here.

*First*, this action, like *Kutzner*, is an FTC enforcement action in which there are factual disputes in the underlying case. Yet importantly, and unlike *Kutzner*, there are **no** factual disputes regarding the Debt Settlement Business—i.e., the very property that the Receiver is trying to sell—because the Complaint does not allege that the Debt Settlement Business engaged in materially unfair or deceptive acts or practices, or collect up front frees. *See* FTC Act, 15 U.S.C. § 45 (giving the FTC authority to seek an order to enjoin businesses from engaging in unfair or deceptive practices).

*Second*, allowing the sale of the Debt Settlement Business would run counter to the preliminary injunction because it will permanently alter the status quo by transferring the Arete Individuals' interests in the Debt Settlement Business to another party, thus

11

"*stripping them of their ownership interest in their assets*" and causing them irreparable harm.

*Finally*, the Application cites to no authority providing that "the Receiver has the authority to sell property . . . under the terms of a preliminary injunction in an enforcement action before a defendant's liability has been determined," particularly where, as here, the subject of the sale—the Debt Settlement Business—is not part of the enforcement action. Indeed, the ***only*** authority the Receiver invokes to justify his actions is the catchall provision in the PI Order, which states that the Receiver may "perform all acts necessary or advisable to preserve the value of those Assets."  Appl. 2:1-2.  That is the same provision the Receiver invoked and the Court rejected in *Kutzner* before explaining the myriad of reasons why a sale should not occur.  *Kutzner*, 2017 WL 5188334, at *4.

**B.      The Receiver seeks approval of the sale under 28 U.S.C. § 2004, but he does not cite that provision in his brief, let alone satisfy its strict requirements.**

While the Receiver does not cite 28 U.S.C. § 2004, he nevertheless seeks approval of the sale of the Debt Settlement Business under that section because he cites it in the proposed order he lodged with the Court.  *See* Dkt. No. 95-5 Order ¶ 8 (stating "[t]he sale of Arete's consumer debt settlement accounts is authorized and approved under 28 U.S.C. § 2004 without further notice, hearing, or court order"). The Receiver has not satisfied that statute.

Section 2004 states, in relevant part, that "[a]ny personalty sold under any order or decree of any court of the United States shall be sold in accordance with section 2001 of this title, unless the court orders otherwise."  28 U.S.C.§ 2004.  Section 2001, in turn, states: (1) "[b]efore confirmation of any private sale, the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or situated in different localities," (2) "[n]o private sale shall be confirmed at a price less than two-thirds of the appraised value," (3) "[b]efore confirmation of any private sale, the terms thereof shall be published in such newspaper or

newspapers of general circulation as the court directs at least ten days before confirmation," and (4) "[t]he private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale."  28 U.S.C. § 2001(b)

The Receiver has not sought the appointment of three disinterested appraisers; there is no evidence that the sale of the Debt Settlement Business is at a price more than two-thirds of the appraised value; there is no evidence that the Receiver has published the terms of the sale in a newspaper; and there is no process for submitting overbids.

Setting aside the lack of any proof that Arete's Debt Settlement Business was unlawful or that disposing of it prior to adjudication on the merits and without allegations of wrongdoing would cause irreparable harm, selling that business for less than its full potential is imprudent and inappropriate.

### C. Now that the Receiver has secured records concerning Arete, and given the absence of any evidence or allegations concerning materially deceptive conduct in Arete's Debt Settlement Business, control should be returned to the Arete Individuals.

The Receiver took possession of Arete's premises upon issuance of the TRO and ceased all business operations.  Dkt. No. 83-1 at II.A. and III.  Later, the Receiver sought, and the Arete Individuals did not oppose, sale of property held at the receivership sites (unless the property was later abandoned by the Receiver).

However, the Arete Individuals have consistently maintained that they should be allowed to operate the Debt Settlement Business using third-party financing to engage in such operations given the freezing of their assets.  *See* Hawbecker Decl., **Ex. 2** (1/6/20 email from Arete's counsel to the Receiver).   While the Receiver initially agreed to this concept, the FTC apparently told the Receiver that they would not agree to the Arete Individuals running the business.

Despite being informed of Arete's Debt Settlement Business customers' ongoing needs and the potential harm that they would face if they were not reminded to manage their

payments to creditors (*see* Dkt. No. 49-3, ¶ 4; Hawbecker Decl., ¶ 2),[14] rather than transferring the Debt Settlement Business to the Arete Individuals to run from a third party location with independent financing (or clarifying with the Court his ability to do so), the Receiver listened only to the FTC and unilaterally decided to sell that business to a third party.

*Implicit in the Receiver's desire to sell the debt settlement accounts managed by Arete, and the FTC's non-opposition to the sale, is the admission of the lack of evidence that these accounts were procured through deceptive acts or practices.* When the action was initiated, the FTC believed that the money held in Debt Pay Gateway included student loan debt relief customers' money. Hawbecker Decl., ¶ 2.

After the FTC and Receiver realized that (i) the Debt Settlement Business was distinct from the student loan services business, (ii) the student loan services business had wound down but for the collection of student loan recertification fees on legacy student debt service accounts,[15] and (iii) the separate Debt Settlement Business needed to service the approximately 7,700 accounts for Arete's debt settlement customers,[16] both the FTC and the Receiver appeared open to the Arete Individuals servicing that separate business with third party financing. Hawbecker Decl., ¶ 2.

As set forth above, the Receiver's proposed sale of accounts held by Arete's Debt Settlement Business is improper and irreversible. Further, there is no evidence that Arete's Debt Settlement Business customers were deceived, that fees were unlawfully collected, or that the Arete Individuals otherwise engaged in unlawful misrepresentations to Arete's Debt Settlement Business customers. Given their familiarity with the business, the Arete

---

[14] The Receiver now acknowledges the Arete Individuals' early assertion of the need to maintain the accounts held on behalf of consumers in Debt Pay Gateway. *See* Dkt. No. 95-2, McNamara Decl. ¶ 6.

[15] *See e.g.*, Dkt. No. 49-1 at ¶¶ 5-10 (explaining that Arete's student loan website had been shuttered and that fees for that business ran through World Pay and vPay whereas debt settlement payments ran through Debt Pay Gateway).

[16] *See e.g.*, Dkt. No. 49-3 at ¶¶ 3-5.

OPPOSITION TO *EX PARTE* APPLICATION

Individuals are in the best position to resume operations of Arete's Debt Settlement Business and are ready, willing, and able to secure third party financing to do so.  *See* Hawbecker Decl., **Ex. 2**.  As such, the Court should deny the Application and confirm that the Receiver should return Arete's Debt Settlement Business operations and the Debt Pay Gateway accounts and agreements to the Arete Individuals.[17]

The FTC has not filed a complaint or otherwise demonstrated their authority to seek an order shuttering Arete's Debt Settlement Business or demonstrating that it is illegally run.  Until it does so, the Arete Individuals should be entitled to run that business in conformity with the law.

**IV.   Conclusion.**

For the reasons discussed above, the Court should deny the Application and clarify that Arete's Debt Settlement Business, including the Debt Pay Gateway accounts, should be returned to the defendants Howe, Palacios, Hsu, and Pomazi and direct the Receiver to cooperate in the timely transfer of information and access to systems needed to run that business.

Dated:  January 9, 2020

BIENERT | KATZMAN PC

By: _____
    Thomas H. Bienert, Jr.
    Ariana Seldman Hawbecker
    Ali Matin
    Attorneys for Defendants
    Carey G. Howe, Ruddy Palacios,
    Shunmin Hsu, and Oliver Pomazi

---

[17] The Arete Individuals will stipulate that the fees earned by Arete as of the entry date of the PI may be frozen pending adjudication on the merits of the FTC's claims given the Court's findings concerning the commingling of funds.

OPPOSITION TO *EX PARTE* APPLICATION

## DECLARATION OF ARIANA HAWBECKER

I, Ariana Hawbecker, declare as follows:

1.      I am an attorney at Bienert | Katzman PC, counsel of record for defendants Carey G. Howe, Ruddy Palacios, Shunmin Hsu, and Oliver Pomazi ("Arete Individuals"). I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.  All undefined terms shall the meaning ascribed to them in the preceding opposition.

2.      I have had multiple conversations with the FTC's attorneys and the Receiver concerning Arete's Debt Settlement Business.  During an initial phone call on November 9, 2019 shortly following my firm's retention by the Arete Individuals, we explained that Arete had shifted its focus to negotiating consumer debt.  We further explained that it was important that settlements brokered by Arete on behalf of its Debt Settlement Business clients could be in jeopardy without ongoing and active management by Arete.  We also explained during this phone call that funds held in Debt Pay Gateway were solely part of Arete's Debt Settlement Business.  The FTC was not aware of this fact.  Further, we asked that Arete's business operations be returned to the Arete Individuals

3.      On November 17, 2019, I spoke to the FTC's attorneys and again expressed my clients' desire to get Arete's Debt Settlement Business up and running.  The FTC maintained that any such business would have to be run with independent third-party financing.

4.      Despite my clients' affirmed desire to run Arete's Debt Settlement Business, in mid-December 2019, I became aware of efforts by the Receiver to sell Arete's Debt Settlement Business accounts.  We again informed the Receiver that my clients should be permitted to operate the business because it was not part of the business practices covered by the FTC's Complaint.  True and correct copies of my email correspondence on the subject of the running of the Debt Settlement Business are attached hereto as **Exs. 1 and 2**.

1        I declare under penalty of perjury under the laws of the United States that the

2  foregoing is true and correct.

3        Executed the 9th day of January 2020 at San Clemente, California.

4

5

6                      Ariana Hawbecker

# EXHIBIT

# "1"

| | |
|---|---|
| **From:** | Ariana Hawbecker |
| **To:** | Edward Chang; Fairchild, Stephen; Ali Matin; bill@WRMBIZLAW.COM |
| **Cc:** | McKewen, Richard; Thomas H. Bienert |
| **Subject:** | RE: Federal Trade Commission v. American Financial Support Services Inc. - Receiver"s Ex Parte Application |
| **Date:** | Thursday, December 19, 2019 4:54:00 PM |

Dear Ed,

I note that the application makes a general reference to the "receivership's assets" and makes reference to "student loan debt relief operations" but is silent as to the debt settlement business including (1) a position as to whether you claim that this is an asset of the receivership estate and on what basis; (2) whether it can be operated legally and profitably; and (3) whether it is going to be sold or abandoned.

Can you please clarify what the receiver's position is at to the debt settlement business, particularly the current clients of Arete's debt settlement business with funds in Debt Pay Gateway. As we have previously mentioned, we believe that this business is outside of the scope of the FTC's complaint, was compliant, and can be operated legally and profitably; in fact, our clients have asked to operate it.  So, it is important for us to know your intentions as to that business.

Finally, can you please specify what assets you intend to abandon and by what method? To the extent the receiver does intend to abandon assets, our clients should receive prior notice and have an opportunity to claim such abandoned property.

We need to know the answers to the above questions before we can take a position as to your application. If you prefer to have a call, we are available between 10:30 and 12 and 1-3 tomorrow.

Sincerely,
Ariana

**Ariana Seldman Hawbecker** | Partner
Bienert | Katzman PC

Website | vCard | Profile

---

**From:** Edward Chang <echang@mcnamarallp.com>
**Sent:** Thursday, December 19, 2019 11:12 AM
**To:** Fairchild, Stephen <sfairchild@ftc.gov>; Ali Matin <amatin@bienertkatzman.com>;
bill@WRMBIZLAW.COM
**Cc:** McKewen, Richard <RMCKEWEN@ftc.gov>; Thomas H. Bienert
<tbienert@bienertkatzman.com>; Ariana Hawbecker <ahawbecker@bienertkatzman.com>
**Subject:** Federal Trade Commission v. American Financial Support Services Inc. - Receiver's Ex Parte
Application

All,

I spoke with you last Thursday or Friday concerning the Receiver's plan to preserve the Receivership
Entities' Documents, sell or abandon Receivership Entities' Assets, return leased vehicles (if there's
no equity), and return the leased premises to the landlords.  Since not everyone was willing to enter
a stipulation, the Receiver plans on filing an ex parte application.  The draft memorandum in support
of the ex parte application and the proposed order are attached.

Based on our prior telephone calls, I believe the FTC will either support or take no position on the ex
parte application, Carey Howe, Ruddy Palacios, Shunmin Hsu, and Oliver Pomazi will take no position
on the ex parte application, and American Financial Support Services, US Financial Freedom Center,
and Jay Singh will oppose the ex parte application.  Please note that any opposition to the ex parte
application must be filed no later than 24 hours following service of the ex parte application.  *See*
Judge Selna's Procedure #6, https://www.cacd.uscourts.gov/honorable-james-v-selna.  Please advise
if I am accurately representing each party's position or provide the party's updated position.

Finally, if the parties are now willing to enter a stipulation, please advise and I will convert the ex
parte application to a stipulation.

Ed

Edward Chang
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, CA 92101
Direct:   619-269-0446
Main:   619-269-0400
Fax:       619-269-0401
echang@mcnamarallp.com
http://mcnamarallp.com

# EXHIBIT

# "2"

| | |
|---|---|
| **From:** | Ariana Hawbecker |
| **To:** | Thomas McNamara |
| **Cc:** | Edward Chang; Ali Matin; McKewen, Richard; Fairchild, Stephen |
| **Subject:** | RE: Arete Ex Parte Application |
| **Date:** | Monday, January 6, 2020 9:58:00 AM |

Tom,

As we have mentioned many times in the past, our clients are ready willing and able to run Arete's debt settlement practice.  Also to reiterate, we do not believe that Arete's debt settlement business (which was distinct and separate from the student loan business) falls under your authority as you indicated yourself in your previous report to the court.

We further believe that the transition of the DPG customers back to our clients best serves the interests of consumers whose debts Arete was in the process of or had already negotiated at the time the TRO was entered.  As you note in your declaration (and as our clients stressed in their opposition to the PI and as we have done several times during our phone calls): "Both companies stressed, consistent with what we have heard time-and-again from Debt Pay Gateway's counsel, that the sooner the transition occurs the better for customers – as the customers have been without any form of customer service for almost two months and this could result in negative consequences with creditors."

Sincerely,
Ariana

**Ariana Seldman Hawbecker** | Partner
Bienert | Katzman PC
Website | vCard | Profile

---

**From:** Thomas McNamara <tmcnamara@mcnamarallp.com>
**Sent:** Sunday, January 5, 2020 1:23 PM
**To:** Fairchild, Stephen <sfairchild@ftc.gov>; McKewen, Richard <RMCKEWEN@ftc.gov>; Ariana Hawbecker <ahawbecker@bienertkatzman.com>; Ali Matin <amatin@bienertkatzman.com>
**Cc:** Edward Chang <echang@mcnamarallp.com>
**Subject:** RE: Arete Ex Parte Application

Folks,

Based on Ariana's information and Revitafi's lack of candor, we have informed Revitafi we will not be moving forward on their offer.
We will go back to the folks who were previously interested.  We will inform the parties if we get an offer worth accepting.
Thanks.

Thomas W. McNamara
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, CA 92101
Direct:  619-269-0499
Main:   619-269-0400
Fax:      619-269-0401
tmcnamara@mcnamarallp.com
http://mcnamarallp.com

---

**From:** Thomas McNamara
**Sent:** Friday, January 03, 2020 2:08 PM
**To:** Fairchild, Stephen <sfairchild@ftc.gov>; McKewen, Richard <RMCKEWEN@ftc.gov>; Ariana Hawbecker <ahawbecker@bienertkatzman.com>; Ali Matin <amatin@bienertkatzman.com>
**Cc:** Edward Chang <echang@mcnamarallp.com>
**Subject:** FW: Arete Ex Parte Application

Folks,

As Ed Chang communicated to both parties just before Christmas, we intend to file an *ex parte* application to sell the Arete debt settlement accounts to a third party.  The Arete Defendants have indicated they oppose the application.  The FTC asked to see a draft of the papers prior to taking a position.  As such, please find attached the draft papers.  We believe these are close to final, and further changes will not be material.

We had hoped to have a declaration from Debt Pay Gateway but it looks like they will not get it to us today.  We intend to file today without the declaration at this point.

Steve and Richard, can you let us know your position as soon as possible.  Thank you.

Thomas W. McNamara
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, CA 92101
Direct:  619-269-0499
Main:   619-269-0400

Fax:      619-269-0401
tmcnamara@mcnamarallp.com
http://mcnamarallp.com

---

**From:** Jill Jacobs
**Sent:** Friday, January 03, 2020 1:39 PM
**To:** Thomas McNamara <tmcnamara@mcnamarallp.com>
**Cc:** Edward Chang <echang@mcnamarallp.com>
**Subject:** Arete Ex Parte Application


Jill Jacobs
Legal Assistant
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, CA 92101
Direct:   619-269-0491
Main:    619-269-0400
Fax:      619-269-0401
jjacobs@mcnamarallp.com
http://mcnamarallp.com/

## CERTIFICATE OF SERVICE

I, Carolyn K. Howland, declare that I am a citizen of the United States and am employed in Orange County, California; my business address is 903 Calle Amanecer, Suite 350, San Clemente, California 92673; I am over the age of 18 and not a party to the above-entitled action. I am employed by a member of the United States District Court, and at whose direction I caused service of the following document on all parties in this action via the method of service described below.

- ARETE INDIVIDUALS' OPPOSITION TO EX PARTE APPLICATION BY RECEIVER FOR ORDER APPROVING AND CONFIRMING SALE OF RECEIVERSHIP ENTITY'S DEBT SETTLEMENT ACCOUNTS; DECLARATION OF ARIANA HAWBECKER IN SUPPORT

**[X] BY ELECTRONIC TRANSMISSION:** by electronically filing the foregoing with the Clerk of the District Court using its CM/ECF System pursuant to the Electronic Case Filing provision of the United States District Court General Order and the E-Government Act of 2002, which electronically notifies said parties in this case:

| | |
|---|---|
| Stephen Fairchild | Thomas McNamara |
| Richard McKewen | Edward Chang |
| Federal Trade Commission | Sanjay Bhandari |
| 915 2nd Avenue, Suite 2896 | Cornelia Julianna Boleyn Gordon |
| Seattle, WA 98174 | McNamara Smith LLP |
| sfairchild@ftc.gov | 655 W. Broadway, Suite 1600 |
| rmckewen@ftc.gov | San Diego, CA 92101 |
| | echang@mcnamarallp.com |
| | sbhandari@mcnamarallp.com |
| Robert Quigley | cgordon@mcnamarallp.com |
| Federal Trade Commission | |
| 10990 Wilshire Blvd, Suite 400 | |
| Los Angeles, CA 90024 | |
| rquigley@ftc.gov | |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 9, 2020, at San Clemente, California.

Carolyn K. Howland
Carolyn K. Howland